Proctor J. BAKER, Petitioner,

v.

CITY OF FAIRBANKS, Alaska, Respondent.

No. 1141.

Supreme Court of Alaska.

June 5, 1970.

Lloyd I. Hoppner, of Rice & Hoppner, Fairbanks, for petitioner.

Howard Staley and Stephen S. DeLisio of Merdes, Schaible, Staley & DeLisio, Fairbanks, for respondent.

Before BONEY, C. J., and DIMOND, RABINOWITZ and CONNOR, JJ.

CONNOR, Justice.

This case raises important questions about the right to jury trial for certain city ordinance violations. This necessarily means that we must reconsider the rationale of the opinion in Knudsen v. City of Anchorage, 358 P.2d 375 (Alaska 1960), which held that a person charged with a violation of a city ordinance prohibiting reckless driving was not entitled to a jury trial. Since *Knudsen* was decided, the United States Supreme Court in Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), has made applicable to the states, through the Fourteenth Amendment due process clause, the Sixth Amendment right to jury trial in criminal cases

other than those traditionally labeled "petty offenses." It is with the implications of the *Duncan* decision and the Sixth Amendment right to jury trial that we must deal in the present decision.

In the case before us petitioner was charged in the District Court at Fairbanks, Alaska, with violating a City of Fairbanks ordinance, in that he did "assault Bradley W. Hollister by throwing him into the wall and refrigerator" contrary to Fairbanks City Code, Section 6.101(b).[1]

Petitioner asserted in the courts below that he was entitled to a jury trial. His claim was denied. He then filed a petition for review with this court. We have granted review of this case because of the importance of the question which is raised by petitioner.[2]

Petitioner argues that under Duncan v. Louisiana, supra, he is entitled to a jury trial as a matter of right, and that the specific holding of *Duncan* is dispositive of his case.

In *Duncan* the Court held that one charged with assault and battery under Louisiana law, which offense carried a maximum possible penalty of two years' imprisonment, or a $300 fine, or both, must be afforded a jury trial. Louisiana had contended that assault and battery traditionally was recognized to be a "petty offense," and that there was, therefore, no constitutional requirement that it must be tried by a jury. The offense, despite the somewhat long possible period of imprison-

1. City of Fairbanks Code of Ordinances, § 6.101(b) provides:
"(b) *Assault* No person shall beat, strike, wound, imprison, or inflict violence on another where the circumstances show malice or assault another with intent to commit murder, rape, mayhem, robbery or larceny. Nor shall any person assault another with a lethal weapon, instrument, or thing with intent to commit upon the person of another any bodily injury where no considerable provocation appears or where the circumstances of the assault show malice."
City of Fairbanks Code of Ordinances, § 1.108 provides that the maximum pun-

ishment shall be "by fine of not more more than Six Hundred and 00/100 ($600.-00) Dollars or by imprisonment for not more than sixty (60) days, or by both such fine and imprisonment."

2. Alaska Sup.Ct.R. 23, 24: "This court grants review because the order of the Superior Court judge affects a substantial right of petitioner and is of such substance and importance as to justify deviation from the normal appellate procedure by way of appeal in order that the questions of law be given the immediate attention of this court." Knudsen v. City of Anchorage, 358 P.2d 375–376 (Alaska 1960).

ment, was classified as a misdemeanor under Louisiana law. It was also contended that the granting of a jury trial was a matter for state determination and not a part of federal due process of law.

In rejecting Louisiana's claims, the Court in *Duncan* determined that the right to jury trial, as expressed in the Sixth Amendment, must be made applicable to the states of the Union as part of the due process of law guaranteed by the Fourteenth Amendment. Mr. Justice White, speaking for the Court, stated:

"Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." 391 U.S. at 149, 88 S.Ct. at 1447 (footnote omitted).

In declaring the right to jury trial to be a fundamental right comprehended under the federal notion of due process of law, the Court abandoned an older group of cases which had implied that jury trial might not be necessary to satisfy the guarantee of the Fourteenth Amendment.

The Court in *Duncan* recognized that there is within the Sixth Amendment an area where the trial by jury of certain offenses is not constitutionally required. This implied exception has been read into the Sixth Amendment by the courts over a period of many years, despite the express language of the amendment.

A literal reading of the Sixth Amendment would tell the reader that, as a matter of plain English, all offenses which can be regarded as criminal must be tried by jury if the defendant demands such a trial.[3] Despite this apparently plain language, some courts have adhered to the position that, because certain offenses were not triable by jury at the time our Republic was founded, the framers of our federal constitution did not mean to include such offenses as being triable by jury under the guarantees of the Sixth Amendment and similar state guarantees of jury trial. This position was reaffirmed in the *Duncan* case, with certain important qualifications.

In elaborating upon what this Sixth Amendment guarantee includes, Mr. Justice White explained:

"Of each of these determinations that a constitutional provision orginally written to bind the Federal Government should bind the States as well it might be said that the limitation in question is not necessarily fundamental to fairness in every criminal system that might be imagined but is fundamental in the context of criminal processes maintained by the American States.

"When the inquiry is approached in this way the question whether the States can impose criminal punishment without granting a jury trial appears quite different from the way it appeared in the older cases opining that States might abolish jury trial. See, e. g., Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 44 L.Ed. 597 (1900). A criminal process which was fair and equitable but used no juries is easy to imagine. It would make use of alternative guarantees and protections which would serve the pur-

---

3. U.S.Const. Amend. VI: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

In Schick v. United States, 195 U.S. 65, 79, 24 S.Ct. 826, 831, 49 L.Ed. 99 (1904), Mr. Justice Harlan (dissenting) stated the following: "The contention in the present prosecutions is that, although the positive constitutional injunction that the trial of all crimes shall be by jury furnishes an inflexible rule that may not

be ignored in cases of felony, that rule, even where the accused pleads not guilty, may be disregarded altogether in a trial for a misdemeanor, provided he consents to be tried by the court without a jury. Plainly, such an exception is unauthorized by the Constitution if its words be interpreted according to their ordinary meaning. Nor, in my opinion, it is consistent with the fundamental rules of criminal procedure, as established and enforced at common law."

poses that the jury serves in the English and American systems. Yet no American State has undertaken to construct such a system. Instead, every American State, including Louisiana, uses the jury extensively, and imposes very serious punishments only after a trial at which the defendant has a right to a jury's verdict. In every State, including Louisiana, the structure and style of the criminal process—the supporting framework and the subsidiary procedures—are of the sort that naturally complement jury trial, and have developed in connection with and in reliance upon jury trial." 391 U.S. at 149–150, 88 S.Ct. at 1448, n. 14.

In other words, the Court stressed the importance of providing procedures which are fundamentally fair within the context of our present-day American system of criminal justice.

In *Duncan* the Court held that a jury trial was required for the offense of assault and battery, even though that offense, considered by its label alone, did not historically come within the concept of a "serious misdemeanor." From the language used by the Court, it appears that the maximum possible sentence was the influential factor in determining that assault and battery, at least in Louisiana, was not a petty offense, despite the nomenclature attached by the State. As the Court explained:

> "It is doubtless true that there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision and should not be subject to the Fourteenth Amendment jury trial requirement here applied to the States. Crimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses. But the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the Sixth Amendment. The penalty

authorized by the law of the locality may be taken 'as a gauge of its social and ethical judgment' of the crime in question." 391 U.S. at 159–160, 88 S.Ct. at 1453 (footnotes and citations omitted).

The Court noted that in the federal system Congress has defined petty offenses as those punishable by no more than six months in prison and a $500 fine. Additionally, it noted that in 49 of the 50 states, crimes which are subject to trial without a jury, which sometime include simple assault and battery, are punishable by no more than one year in jail. Further, the vast catalogue of crimes which were triable without a jury in 18th Century America, that is, before the framing of the United States Constitution, the Bill of Rights, and the various state constitutions, were, with rare exceptions, punishable by no more than a six-month period of incarceration. Most importantly, the Court in *Duncan* did not adopt a mechanical test for distinguishing between petty offenses and serious misdemeanors.

> "We need not, however, settle in this case the exact location of the line between petty offenses and serious crimes. It is sufficient for our purposes to hold that a crime punishable by two years in prison is, based on past and contemporary standards in this country, a serious crime and not a petty offense." 391 U.S. at 161–162, 88 S.Ct. at 1454.

Traditionally two main approaches have been used by the courts in determining whether a crime was petty or serious. The first approach looks to the maximum possible punishment—not the punishment actually imposed by the court—as a gauge of the sentiments of the locality or of the lawmakers in determining whether, because of the severity of the punishment, the offense should be regarded as serious in itself. Duncan v. Louisiana, supra.

■ The second approach is to look to the nature of the offense, consider its common law background, if any, consider whether it carries sufficient opprobrium to require its being labeled a "serious" mis-

demeanor, and consider also the consequences of conviction of such an offense.

"The truth is, the nature of the offense, and the amount of punishment prescribed, rather than its place in the statutes, determine whether it is to be classed among serious or petty offenses,—whether among crimes or misdemeanors." Schick v. United States, 195 U.S. 65, 68, 24 S.Ct. 826, 827 (1904).

Upon an evaluation of all these factors together hinges the determination of whether the offense is serious enough to require jury trial. It is important to note that under this second approach the maximum possible sentence is not the test of seriousness. Even though the lawmaker has provided a relatively slight sentence, this will not render the offense "petty" if it otherwise has serious connotations. As this court noted in Knudsen v. City of Anchorage, supra, the "quality of the offense and the consequences to the accused are the factors which determine whether there is a constitutional right to trial by jury." [4] In short, the courts retain residual constitutional power to determine that an offense, whatever its possible punishment may be, is serious and requires a jury trial, despite the views of the lawmaker as expressed merely in the maximum permissible sentence which may be imposed. As the Court stated in *Duncan*:

"Of course the boundaries of the petty offense category have always been ill-defined, if not ambulatory. In the absence of an explicit constitutional provision, the definitional task necessarily falls on the courts, which must either pass upon the validity of legislative attempts to identify those petty offenses which are exempt from jury trial or, where the legislature has not addressed itself to the problem, themselves face the question in the first instance. In either case it is necessary to draw a line in the spectrum of crime, separating petty from serious infractions. This process, although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little." 391 U.S. at 160–161, 88 S.Ct. at 1453.

Petitioner argues that because under the Fairbanks ordinance he could have been sentenced to either two months in jail, a $600 fine, or both, that the offense with which he is charged is necessarily a serious one. This contention is based upon the fact that the United States Supreme Court in *Duncan* alluded to the congressionally enacted standard of what constitutes a petty offense. He argues that because Congress employs a six-month or $500-fine test to distinguish petty from serious, we are bound by that same test. Because petitioner could possibly be sentenced to pay a $600 fine, he asks that we declare on this basis alone that he has a right to a jury trial. We feel that this argument misapprehends what the Court decided in *Duncan*. Although the Court there mentioned the congressional standard, it did not make that standard applicable to the states. In establishing guidelines for the lower courts to follow, the Court had this to say:

"In determining whether the length of the authorized prison term or the seriousness of other punishment *is enough in itself to require a jury trial,* we are counseled by District of Columbia v. Clawans, supra, [300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843] to refer to objective criteria, chiefly the existing laws and practices in the Nation." 391 U.S. at 161, 88 S.Ct. at 1453 (emphasis supplied.)

We think it would be unreflective for us to hold that the mere accident that petitioner might pay a fine of $600 rather than $500 should determine his right to a jury trial. We are unable to read the *Duncan* decision as requiring the application of any such mathematical standard. As that decision points out, Congress is not the body which exercises exclusive power

4. 358 P.2d at 383.

in determining what offenses are petty or serious. The courts have additional power which must be exercised independently. Nor did the Court in *Duncan* hold that the congressional standard should provide the test to be applied to the states under the Fourteenth Amendment. More analysis is required to achieve a reasoned solution.

The historical development influencing the concept of what constitutes a "petty" offense has been treated in depth in a well-known law review article by Frankfurter and Corcoran.[5] In that article the authors survey the legal history of offenses handled in a summary fashion in England and in the American colonies. They deal with a variety of offenses which did not carry with them the right to trial by jury. In treating these non-jury offenses, the authors stress that the historical genealogy of the right to jury trial should be a major guide in the interpretation of the Sixth Amendment of the Constitution, as well as article III, section 2 of the Constitution.[6] Article III refers to "all crimes" as being triable by jury, and the Sixth Amendment refers to the right to jury trial in "all criminal prosecutions." The authors concluded that these two terms should be considered interchangeable. But they also determined that there were certain offenses, familiar to the framers of our federal and state constitutions, which were considered to fall within an implied exception to the constitutional guarantee. This accords with the interpretations of the United States Supreme Court. Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966); District of Columbia v. Clawans, 300 U.S. 617, 57 S. Ct. 660, 81 L.Ed. 843 (1937); Schick v.

United States, 195 U.S. 65, 24 S.Ct. 826 (1904); Natal v. Louisiana, 139 U.S. 621, 11 S.Ct. 636, 35 L.Ed. 288 (1891).

While the argument advanced is well documented, it is perhaps so well ministered that it says too much. As one legal scholar noted,

> "If that practice [the English practice of dealing with petty offenses summarily] proves anything at all in this connection, it proves too much. For as Frankfurter and Corcoran point out, summary trials in England were not restricted to such crimes [petty offenses]." Kaye, Petty Offenders Have No Peers, 26 U.Chi.L.Rev. 245, 247 (1959) (citations omitted).

Prosecutions of serious crimes were also authorized without jury intervention.[7] Blackstone was even moved to comment upon the constantly increasing scope of summary jurisdiction, lamenting that it "has of late been so far extended, as, if a check be not timely given, to threaten the disuse of our admirable and truly English trial by jury, unless only in *capital* cases!" 4 Blackstone Comm. 277–78 (Blackstone's emphasis).

In the subject matter before us, one looking only to the past will find a jumble of offenses with no coherent, rationalizing principle by which to determine the line between what is a petty and a serious crime.[8] For example, "[v]iolations of the laws relating to liquor, trade and manufacture, labor, smuggling, traffic on the highway, the Sabbath, 'cheats', gambling, swearing, small thefts, assaults, offenses to property, servants and seamen, vagabondage, and disorderly conduct were largely in the

---

5. Frankfurter and Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv.L.Rev. 917 (1926).

6. U.S.Const. art. III, § 2: "The trial of all crimes, except in cases of impeachment, shall be by jury * * *."

7. E. g., 22 & 23 Car. II, c. 7 (1670) punished, apparently without jury trial,

the burning of houses at night with transportation for seven years; and made the offense a felony. See Frankfurter and Corcoran, supra note 5, at 926, n. 34 and at 960, n. 216; Md.Sess.Laws, c. 3 (1782).

8. Frankfurter and Corcoran, supra note 5, at 927.

justices' hands."[9] Penalties ranged from a fine of three shillings fourpence for "the individual who tippled long at the alehouse" to a fine of 500 pounds with confinement at hard labor until paid, for the bribery of an excise officer.[10]

What is often not perceived about this influential article is that the authors were not arguing that historical usage should necessarily govern modern constitutional adjudication. As the authors point out, historical continuity does not require rigid adherence to an historical stereotype.

> "We have reached the end of the narrow inquiry which this paper proposed. The evidence has been summarized to indicate the common-law history of penal legislation which dispensed with the jury. Both in England and in the colonies a clear and unbroken practice—despite all uncertainties and reservations—emerges for two centuries preceding the Constitution. Many offenses were customarily tried solely by magistrates. These offenses were compendiously characterized as 'petty.' But pettiness was not a rigidly fixed conception; demarcation between resort to jury trial and its dispensation was not mechanical. In subjecting certain conduct to the summary procedure of magistrates, unguarded by the popular element, there was an exercise of moral judgment dividing behavior into serious affairs and minor misdeeds. The gravity of danger to the community from the misconduct largely guided the moral judgment; the wide repetition of the act, raising practical problems of enforcement, in part influenced the moral value which the community attached to the act."[11]

Unfortunately, not too many cases dealing with the petty offense problem required a decision by the United States Supreme Court. A large number of federal offenses clearly fall within the category of serious misdemeanors because they carry a maximum punishment of more than six months. Most of those cases which disallow jury trial are easily distinguishable as treating offenses which are regulatory in nature. A careful analysis of the decisions of the United States Supreme Court will reveal that only rarely and for rather trifling offenses has jury trial actually been denied.

In District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660 (1937), the accused was charged with selling the unused portions of railway excursion tickets in violation of a congressional statute. The Court, in denying jury trial to the accused, had the following to say about the nature of the offense:

> "Engaging in the business of selling second-hand property without a license was not indictable at common law. Today *it is at most but an infringement of local police regulations, and its moral quality is relatively inoffensive.*" 300 U.S. at 625, 57 S.Ct. at 662 (emphasis supplied).

In Schick v. United States, supra, the Court upheld the conviction without a jury of a defendant who had violated a statute which prohibited the receipt for sale of any unstamped oleomargarine. The case has two noteworthy features. First, the defendant had waived jury trial. Second, the offense charged was the violation of a regulatory act, the Oleomargarine Act, subjecting the offender to only a $50 fine and no confinement. As Mr. Justice Brewer, speaking for the majority, aptly noted:

> "So small a penalty for violating a revenue statute indicates only a petty offense. It is not one necessarily involving any moral delinquency." 195 U.S. at 67, 24 S.Ct. at 826.

In Callan v. Wilson, 127 U.S. 540, 8 S. Ct. 1301, 32 L.Ed. 223 (1888), the accused was charged with the crime of conspiracy and sentenced to pay a fine of $25 or serve 30 days' confinement. Defendant, with

---

9. Id. at 928 (footnotes omitted).

10. Id. at 930-31.

11. Id. at 980.

others, had conspired to refrain from working with certain other musicians or working for any person who employed these musicians. Mr. Justice Harlan, in explaining why the Sixth Amendment right to jury trial was afforded this defendant, stated that,

> "It is not to be construed as relating only to felonies, or offenses punishable by confinement in the penitentiary. It embraces as well some classes of misdemeanors, the punishment of which involves or may involve the deprivation of the liberty of the citizen. It would be a narrow construction of the constitution to hold that no prosecution for a misdemeanor is a prosecution for a 'crime' within the meaning of the third article, or a 'criminal prosecution' within the meaning of the sixth amendment." 127 U.S. at 549, 8 S.Ct. at 1303.

The above principle was applied in California in Taylor v. Reynolds, 92 Cal. 573, 28 P. 688 (Cal.1891), which held that a violation of a municipal ordinance, blocking the sidewalk, carried with it a right to jury trial, even though the maximum sentence possible was only a $100 fine and 30 days' confinement. In deciding upon the importance of the fact that only a municipal ordinance had been violated, the court in *Taylor* quoted at length from Dillon on Municipal Corporations, Vol. 1, § 433, as follows:

> " 'So, here, where the act or omission sought to be punished by imprisonment under a municipal ordinance *is in its nature not peculiarly an offense against the municipality, but rather against the public at large, and where it falls within the legal or common-law notion of a crime or misdemeanor, and especially where, being of such nature, it is embraced in the criminal code of the state* then the constitutional guaranties intended to secure the liberty of the citizen,

and the right to a trial by jury, cannot be evaded by the nature of the powers vested in the municipal corporation, or the nature of the jurisdiction conferred upon the municipal courts.' " 28 P. at 689 (emphasis supplied).

It is significant in the case at bar that a violation of the municipal ordinance is also a violation of AS 11.15.230.[12]

In District of Columbia v. Colts, 282 U. S. 63, 51 S.Ct. 52, 75 L.Ed. 177 (1930), defendant was put upon trial before a judge and found guilty of reckless driving, his demand for a jury trial being denied. In holding that he was entitled to a jury trial, the Court stated that:

> "Whether a given offense is to be classed as a crime, so as to require a jury trial, or as a petty offense, triable summarily without a jury, depends primarily upon the nature of the offense. The offense here charged is not merely malum prohibitum, but in its very nature is malum in se. It was an indictable offense at common law, * * *" 282 U.S. at 73, 51 S.Ct. at 53.

■ From a review of the cases which have dealt with this subject, certain broad criteria do emerge. In determining whether an offense falls within one category or the other the courts, in the last analysis, have resorted to a weighing or grouping together of various factors. Not only must the maximum possible punishment be considered, but one must look also at the social and moral opprobrium which attaches to the offense, the degree to which it may be regarded as anti-social behavior, the possible consequences to the defendant in terms of loss of livelihood, and whether the offense is one traditionally regarded as a crime or is predominately in the nature of a regulatory offense. It is then necessary to balance the consequences to the defendant against considerations of social and governmental expediency. In short,

---

12. "Assault and assault and battery. A person not armed with a dangerous weapon, who unlawfully strikes or threatens another in a menacing manner, or un-

lawfully strikes or wounds another, is punishable by a fine of not more than $500, or by imprisonment in a jail for not more than six months, or by both."

legal precedents do not provide any specific means of drawing lines. They furnish only a general method for arriving at decisions.

In the past, courts have had difficulty in determining the qualitative difference by which an offense is to be placed in the category of serious or petty. We believe the most critical question is not where the line should be drawn, but why it should be drawn at all.

Substantial reasons of policy must play an important part in any disposition of this problem. These naturally divide themselves into two major groups. On the one hand, we have considerations of convenience or expediency for the state and its legal subdivisions. It imposes a certain burden upon the machinery of government to make every offense triable by jury. There are also some infractions of laws or ordinances which are so slight that probably all reasonable persons would agree that they should not be triable by a jury. District of Columbia v. Clawans, supra. Balanced against the need to allow government to operate as unencumbered as possible is the right of an accused to be convicted, if at all, only by means which are fair.

The argument from expediency contains inherent defects. If an individual right is vested by the Constitution, the overriding demands of governmental efficiency must be of a compelling nature and must be identifiable as flowing from some enumerated constitutional power. To allow expediency to be the basic principle would place the individual constitutional right in a secondary position, to be effectuated only if it accorded with expediency.[13]

This would negate our entire theory of constitutional government. The American constitutional theory is that constitutions are a restraining force against the abuse of governmental power, not that individual rights are a matter of governmental sufferance.

Such an argument may have had validity at a time when the abilities of government were limited to the needs and financial capabilities of an agrarian or early industrial society. Today the government not only provides services to society on a broad basis, it even poses a problem of thrusting the citizenry into a morass of impersonal regulation. The danger today is thought by some to be not too little or too weak a government, but an all too pervasive one, in which individual freedom, responsibility, and dignity are obliterated by a faceless bureaucracy. Any governmental system capable of directly intervening in the life of the citizen from cradle to grave ought to be able to make effective such minimal guarantees of individual rights as are found in the express language of our constitutions. There is no sound reason why

13. City of Canon City v. Merris, 137 Colo. 169, 323 P.2d 614 (Colo.1958).

In Schick v. United States, 195 U.S. 65, 24 S.Ct. 826, 49 L.Ed. 99 (1904), Mr. Justice Harlan in his dissenting opinion placed the argument from expediency within proper perspective.

"It is contended that this mode of trial, at least in misdemeanors involving only a fine, ought to be sanctioned.—indeed, encouraged,—as convenient both for the government and the accused. What was said by Blackstone when referring to summary proceedings authorized by acts of Parliament in particular cases may well be repeated, at this day, whenever it is proposed, upon grounds of convenience, to dispense with juries in criminal prosecutions, and thereby introduce a new mode for the trial of crimes. He said: 'And, however *convenient* these may appear at first (as doubtless all arbitrary powers, well executed, are the most *convenient*), yet let it be again remembered, that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our Constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern.' Book 4, chap. 27, p. 350." 195 U.S. at 99, 24 S.Ct. at 839 (emphasis in original).

a social and economic system which can send men to the moon, develop nuclear weaponry, and, as in the case of Alaska, extract many billions of barrels of oil from the depths of the earth, cannot also honor the guarantee that if one must be subjected to criminal prosecution, it shall, upon demand, be by a jury of his peers.

Another factor which should be considered is that the constitutional language, in its plain meaning, expressly requires a jury trial in "all criminal prosecutions." If an implied exception is to be read into this language, then perhaps we should adopt an approach by which the classification of any offense falling within the gray area between petty and serious should be resolved in favor of a jury trial for the defendant who claims it. Even such an approach as this carries with it certain difficulties. It still does not resolve the ultimate question —where to draw the final line of demarcation. It is immanently more sensible to look to the possible consequences of a denial of jury trial and the reasons for providing this constitutional safeguard.

We can also derive guidance from cases treating the geminous provision of the Sixth Amendment which secures the right to counsel. Several courts have declared, for example, that the right to counsel, as guaranteed by the Constitution, must be afforded to every defendant charged with an offense which may result in incarceration upon conviction.[14]

It is significant that the United States Supreme Court has very recently declared that the "petty offense rule" does not apply to all constitutional guarantees. In Williams v. Oklahoma City, 395 U.S. 458, 89 S.Ct. 1818, 23 L.Ed.2d 440 (1969), the Court applied the equal protection doctrine of Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), to the appeal of a drunken driving conviction under an Oklahoma City municipal ordinance where the defendant was sentenced to 90 days in jail and a $50 fine. The opinion did not mention the "petty offense rule," reaffirmed three weeks earlier in Frank v. United States, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969). Citing Williams v. Oklahoma, supra, the Oregon Supreme Court decided that the Sixth Amendment right to counsel extends to prosecutions for misdemeanors, including violations of municipal ordinances carrying a maximum possible penalty of less than six months and a $500 fine. Stevenson v. Holzman, 89 Or.Adv.Sh. 27, 458 P.2d 414 (Sept. 10, 1969).

*Duncan* counsels us to look to the national standard in determining whether to grant a right to jury trial of certain offenses. Such an approach is sensible since the collateral consequences to the accused are reflected by our mores and standards. In the instant case, one convicted under this ordinance might suffer severe disabilities in obtaining future employment or in having heaped upon him a certain amount of social opprobrium. It is hard to determine how either layman or lawyer might regard a person indicted under this ordi-

---

14. In re Johnson, 62 Cal.2d 325, 42 Cal. Rptr. 228, 398 P.2d 420 (1965); Bolkovac v. State, 229 Ind. 294, 98 N.E.2d 250 (1951); People v. Mallory, 378 Mich. 538, 147 N.W.2d 66 (1967) (concurring opinion); People v. Witenski, 15 N.Y.2d 392, 259 N.Y.S.2d 413, 207 N.E. 2d 358 (1965); City of Toledo v. Frazier, 10 Ohio App.2d 51, 226 N.E.2d 777 (Ohio 1967); Hunter v. State, 288 P.2d 425 (Okl.Crim.1955); State v. Blank, 241 Or. 627, 405 P.2d 373 (1965); City of Tacoma v. Heater, 67 Wash.2d 733, 409 P.2d 867 (1966); State ex rel. Barth v. Burke, 24 Wis.2d 82, 128 N.W. 2d 422 (1964).

In some judicial decisions the right to counsel has been distinguished from the right to jury trial. James v. Headley, 410 F.2d 325 (5th Cir. 1969). This bifurcation of the Sixth Amendment requires a process of subtle reasoning, indeed.

It is said that the right to counsel is necessary to secure the entire panoply of other constitutional rights and is, therefore, more fundamental than the right to a jury trial. There may be degrees of fundamentalness, but the Sixth Amendment itself makes no distinction between these specific rights.

nance, or what he might think about the seriousness and degree of culpability which attaches to one convicted thereunder. There is a continual shifting of moral values in society. What once may have been looked upon as an offense of slight moment may now command the attention of a large number of people. Witness the current emphasis upon research into crimes of violence.[15] Precisely because there is today such a focus of attention upon crimes against the person, we must reassess the nature of the crime of assault and the possible consequences to the defendant. Because societal values do shift, this sort of crime of violence is peculiarly susceptible to appraisal by a jury of one's peers.

In deciding as we do, we are in effect disregarding the suggestions made by those who revere history. We feel that the argument from history is not determinative because what was practical historically is not necessarily adequate to the needs of our times. To look only to history would deny a progressive development of our legal institutions. As the United States Supreme Court stated in Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L. Ed. 232 (1884),

> "[A]s it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mold and shape it into new and not less useful forms." 110 U.S. at 531, 4 S.Ct. at 118.

Because *Duncan* directs that we look to the standards of the nation, we are given a wide range of choice in selecting those policies which we feel are dispositive in deciding whether to extend the right to jury trial. Although it is tempting to abdicate our responsibility by merely looking to procedures as they have existed in the past, we must not succumb to this temptation; rather, we must carefully weigh all of those factors bearing upon this important right.

There is no doubt that the right to jury trial holds a central position in the framework of American justice. Trial by jury is one of the oldest discernible and distinguishing institutions of our Anglo-American system of jurisprudence. Its heritage can be traced in an unbroken line at least from the 14th century forward. The Magna Carta declared that "no freeman shall be taken, or imprisoned, or exiled, or in any other manner destroyed, except by the judgment of his peers, or by the law of the land." [16] The importance of jury trial in the English constitutional tradition was commented upon by Blackstone as follows:

> "Our law has therefore wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown. It was necessary, for preserving the admirable balance of our constitution, to vest the executive power of the laws in the prince: and yet this power might be dangerous and destructive to that very constitution, if exerted without check or control, by justices of oyer and terminer occasionally named by the crown: who might then, as in France or Turkey, imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the English law have, ·with excellent forecast, contrived that * * * the truth of ev-

---

15. See the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Crime in America, p. 23 (U.S. Gov't Printing Office ed. 1967).

16. As quoted in 4 Blackstone Comm. 343 (Cooley ed. 1899). Although there is dispute as to whether judicium parium of the famous chapter 39 was the practical equivalent of our verdict on the facts of "twelve good men and true," the practice can be observed in ordinary criminal trials by at least the beginning of the 1300's. Frankfurter and Corcoran, supra note 5, at 923.

ery accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighboors, indifferently chosen and superior to all suspicion." 4 Blackstone Comm. 349–350 (Cooley ed. 1899).

In the development of our American constitutional system, Alexander Hamilton made the clear observation that,

"The friends and adversaries of the plan of the [Federal] Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government." The Federalist No. 83.

The proposition that a man is entitled to a trial before a panel of his peers does no more than declare a belief in the dignity and integrity of man. Indeed the deprivation of this right was one of the moving forces in fomenting a violent revolution which had as its aim the overthrow of a tyrannous ruler. Such was the proclamation in our Declaration of Independence (1776):

"The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object, the establishment of an absolute Tyranny over these States * * *. He has combined, with others, to subject us to a jurisdiction foreign to our Constitution, and unacknowledged by our laws; giving his Assent to their Acts of pretended Legislation * * * for depriving us, in many cases of the benefit of Trial by Jury * * *."

In spite of a current note of dissent upon the efficacy of jury trial, the right remains a highly coveted one which is presently in great demand throughout the country. This demand should not go unheeded.

We must now consider the effect of the earlier decision of this court in Knudsen v. City of Anchorage, supra. In that case it was held that the Alaska Constitutional Convention, in adopting the wording of the Sixth Amendment to the United States Constitution as the language of the Alaska Constitution, article I, section 11,[17] did not intend to give to that language any broader application than it had been given by the United States Supreme Court at the time our constitution was drafted. A careful analysis of *Knudsen* will facilitate resolution of certain difficulties inherent in that decision.

At the outset, we are confronted with the rule that the intent underlying statutory or constitutional language should first be gathered from the plain meaning of the language itself, viewed on an objective basis. This approach was not employed in *Knudsen*. There is nothing ambiguous about our Alaska constitutional guarantee of the right to jury trial. We could simply hold that the language of the Alaska Constitution means what it plainly says, that jury trial is available in "all criminal prosecutions." As Mr. Justice Holmes observed in Northern Securities Co. v. United States, 193 U.S. 197, 401, 24 S.Ct. 436, 48 L.Ed. 679 (1903), the function of a judge in such instances requires mainly the ability "to read English intelligently." It is only when the meaning of the words used is open to reasonable dispute that one must look to other sources to discover the intention of those who wrote the provision.

In *Knudsen* it is said that the proceedings of the Alaska Constitutional Convention support the conclusion that the framers intended to grant to criminal defendants no broader rights than those which had been developed through the decisional processes of the United States Supreme

---

17. "In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury of twelve, except that the legislature may provide for a jury of not more than twelve nor less than six in courts not of record. * * *"

Court.[18] We do not think that the convention proceedings will support that proposition. In *Knudsen* considerable reliance was placed upon certain remarks of the Chairman of the Committee on Preamble and Bill of Rights which noted that the committee had drawn upon identical language in the federal constitution as a source of the statement of rights in the Alaska Constitution. These remarks noted that certain provisions of the federal constitution had served their purposes well and were well suited to the needs of Alaska. From the fact that these safeguards worked well within the federal system, we cannot simply conclude that the framers of our constitution intended to include the entire corpus of law which had developed in interpreting these provisions. More than mere acceptance of the federal provisions is needed to support such a finding of specific purpose. Nor is there anything in these remarks which even suggests that the Alaska constitutional language should be tied to interpretations by the United States Supreme Court in perpetuity. At later times this court has rejected the notion that it is bound to employ constitutional standards as developed by the United States Supreme Court, first, in the area of separation of church and state,[19] and later in holding that the taking of handwriting exemplars while defense counsel was not present was a denial of the assistance of counsel.[20]

Even assuming, arguendo, that the Alaska Constitution framers intended to accept extant federal standards, *Knudsen* chose to go only halfway with that doctrine by rejecting the ruling of the United States Supreme Court in District of Columbia v.

Colts, supra. In that case the court decided that a defendant charged with reckless driving, as was the defendant in *Knudsen*, must be provided a jury trial because of the nature of the offense.

A careful reading of the minutes of the Constitutional Convention will support an argument in contradiction of the *Knudsen* decision. It is quite apparent from the remarks made by some members of the convention that they believed that the jury trial provision would apply in all cases prosecuted as criminal offenses. The language of one of the committee members is significant on this point:

McNEALY: I don't feel strongly one way or the other in regard to this amendment here. The only reason I objected to the amendment was for the same reason I voted for this in Committee. To allow for juries of six in magistrate courts or in commissioner's courts or justice of peace courts, as they possibly will be, both a prosecuting and defending of cases in these inferior courts there is very often that I have called for a jury of twelve in a commissioner's court on a *traffic violation or a drunken driving charge or some petty misdemeanor*, and the reason I did was because it was the Federal government that was paying twelve dollars a day, I believe, jury's fees, and in looking this over in the Committee I felt that if the state was going to have to pay that, that comes a little closer to home and was purely a financial matter as far as I was concerned. Actually, I believe if the party that was accused of assault and battery or drunken driving or some parking violation or any misdemeanor, that

18. It is true that it was probably not the purpose and effect of section 12 of article I [Alas.Const. art. I, § 11] to enlarge the then existing right to a jury trial. But it also was not the purpose and effect to restrict the right. This is clear from the commentary on this section to the effect that "This section protects the rights of the accused in criminal cases" (Alaska Constitutional Convention, report of Committee on Preamble

and Bill of Rights, December 15, 1955); and from the remarks of the committee chairman that "we tried to provide a procedure which would protect the right to a jury * * *."

19. Matthews v. Quinton, 362 P.2d 932 (Alaska 1961).

20. Roberts v. State, 458 P.2d 340 (Alaska 1969).

he can get ample justice before a jury of six, and it would save the state about $72 on these one-hour trials and further, if he is still not satisfied with the decision of the jury of six he has the right of course then to appeal and have his case heard before a jury of twelve in the higher court, so it was strictly from a financial point of view that gives the legislature power, and I believe that if the legislature, if they feel that people's rights aren't covered by a jury of six, then they can cause the jury to be set at twelve or they can legislate this particular amendment.[21]

The inclusion of the language, not found in the United States Constitution, which provides for a six-man jury in courts not of record can support an inference that the framers of the Alaska Constitution were making a limited exception to an otherwise comprehensive guarantee. That is, while jury trial might generally require a jury of twelve, a jury composed of a smaller number could be used in courts not of record which would be handling relatively slight offenses.

Silence in the convention discussions about the petty offense exception does not support a conclusion that the framers intended to incorporate the petty offense exception as it had been expounded by the federal courts. The framers of our constitution had a background of actual experience in which the jury trial had been available in criminal cases on a broad basis.[22] First, a broad right to jury trial obtained in prosecutions for any offense under territorial law.[23] Second, some municipalities had provided for jury trial, on

21. 2 Alaska Constitutional Proceedings 1317–18 (Jan. 5, 1956).

22. Consequently, the wording of the constitutional guaranty as to the right to a jury trial in all criminal prosecutions must be read in the light of the established practice that existed in Alaska at that time, where in a justice's court one charged with a violation of territorial law constituting a misdemeanor had the right to a jury trial, without regard to the distinction made at common law between petty and more serious offenses, and without regard to the degree of punishment that might be inflicted. Such a right to a jury trial was thus broader than the right preserved by the federal constitution. Therefore, the technique utilized by the Supreme Court of the United States for determining what behavior gave rise to the right to trial by jury and what did not, which consisted of dividing offenses between minor misdeeds and serious affairs, cannot be availed of to determine in Alaska the right to trial by jury in criminal prosecutions which is preserved by the language of article I, section 11 of the state constitution. Neither would the differentiation between severity of sentence and relative lightness be, standing alone, a governing factor.

23. Act of March 3, 1899, ch. 41, § 410, 30 Stat. 1253 [now § 69–2–1, A.C.L.A.1949] provides in part: "That a justice's court has jurisdiction of the following crimes: First. Larceny * * *. Second. As-

sault * * *. Third. Of any misdemeanor punishable by imprisonment in the county jail or by fine, or by both."

Section 418 (as amended by ch. 47, S.L.A.1925 [now § 69–3–11, A.C.L.A. 1949]) provides: "That upon a plea other than a plea of guilty, if the defendant expressly waive a trial by jury, the justice must proceed to try the issue."

Section 419 (as amended by ch. 23, S.L.A. 1933 [now § 69–3–12, A.C.L.A. 1949]) provides: "If a trial by jury be demanded the justice must make an order in writing * * *."

That there was such a right (if not constitutional then of statutory origin) seems clear from a consideration of the law. The justice's court was given jurisdiction of "any misdemeanor" punishable by imprisonment in jail or by fine (§ 69–2–1, A.C.L.A.1949). The trial of a misdemeanor in a justice's court was considered a "criminal action" (§ 69–3–1 et seq., A.C.L.A.1949). If a defendant, charged with having committed a misdemeanor, demanded a trial by jury, then the statute provided that the justice "must make an order in writing accordingly and proceed to select a trial jury" (§ 69–3–12, A.C.L.A.1949).

It is clear that the statutes in effect since 1899 contained no limitations as to the right to trial by jury. There is no other way, that the express language of the statute can be construed. Thus, it is fair to assume that in a justice's court while Alaska was a territory every misdemeanor was triable of right by a jury if

demand;[24] and while other municipalities had not so provided, the question of the entitlement to jury trial had never been tested through an appellate proceeding during territorial times. United States v. Farwell, 76 F.Supp. 35, 11 Alaska 507 (1948), referred to in *Knudsen*, contains only pure dictum to the effect that jury trial was not necessary in municipal ordinance violation cases. If the framers of the Alaska Constitution were aware of the petty offense exception to the Sixth Amendment, their silence about this exception in the convention proceedings and in the remarks on the floor of the convention cannot be taken as evidence of an intention to adopt that exception.

If, historically, jury trial had always been available on a broad basis in Alaska, it is only reasonable to conclude that the

a defendant demanded a jury, and that this was true without any distinction being made between petty and more serious offenses, and without distinction between the possibility of light or severe punishments.

In Rassmussen v. United States, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862 (1905), a prosecution for keeping a bawdy house, it was held that Congress could not substitute a jury of six misdemeanor cases because the Sixth Amendment, applicable to Alaska, required a common law jury of twelve.

24. In the Act of June 6, 1900, ch. 786, § 1 et seq., 31 Stat. 321, authority was given for the incorporation of towns of Alaska. Although this statute gave each town council the authority by ordinance to provide for "police protection," it was held that this was not sufficient statutory authority for the establishment by ordinance of a municipal court. In re Bruno Munro, 1 Alaska 279 (D.Alaska 1901).

This statute was amended by Congress in 1904. Act of April 28, 1904, ch. 1778, 33 Stat. 529. The town council was given express authority to "appoint * * * a municipal magistrate * * * *", upon whom was conferred jurisdiction "of all actions for violation of municipal ordinances." Appeals would lie to the district court from judgments of the magistrate "in the same manner as appeals from the judgments of ex-officio justices of the peace." There was no mention made of a jury trial.

In 1923 the legislature provided that "The rules of proceeding before a municipal magistrate shall be as near as practicable the same as before a justice of the peace, unless otherwise prescribed by ordinance enacted by the council." Law of May 4, 1923, ch. 97, § 24 [§ 16–1–70, A.C.L.A.1949].

No further change was made in the statute, and there was no elaboration as to what was intended by the words "rules of proceeding"—particularly, whether it was intended to incorporate in the proceedings before a municipal magistrate those provisions of territorial law relating to trial by jury in a justice's court. (§§ 69–3–11, 69–3–12, A.C.L.A.1949).

However, as a practical matter it was apparently left to the discretion of the city whether there should be trial by jury. Some cities provided for a jury trial for any misdemeanor upon demand of the defendant. Others made no such provision, and in those cases the municipal magistrate consistently refused to allow jury trials for violations of municipal ordinances. Thus, from this practical application, it might be logical to assume that the language of § 16–1–70, making the rules of proceeding before a municipal magistrate as near as practicable the same as before a justice of the peace, unless otherwise provided by municipal ordinance, could be interpreted as permitting each individual city to choose for itself whether one charged with a violation of a municipal ordinance should be entitled to a trial by jury.

The phrase "rules of proceeding," as used in the statute relating to jurisdiction of magistrates over violation of municipal ordinances (§ 16–1–70, A.C.L.A.1949) means the same thing as "practice and procedure" as used in that portion of the statute relating to the civil jurisdiction of a municipal magistrate. Hence, it is logical to conclude that when the legislature stated that the rules of proceeding for violations of municipal ordinances before a municipal magistrate should be "as near as practicable the same as before a justice of the peace," that it was intended that "rules of proceeding" would include the right to demand a trial by jury, and that this would be the practice in a municipal magistrate's court "unless otherwise prescribed by ordinance enacted by the council." Thus, there is reason for the established practice in Alaska up to the time of statehood, whereby jury trials were authorized in some city courts, and not in others.

See Knudsen v. City of Anchorage, 358 P.2d 375 (Alaska 1960).

framers thought they were continuing an existing practice. This may account for the lack of discussion on the convention floor about the petty offense exception.

For these reasons we do not think that *Knudsen* represents a necessary or adequate reading of the Alaska constitutional language. More recently we have recognized that we are at liberty to make constitutional progress in Alaska by our own interpretations, as long as we measure up to the national standards which are required by the United States Supreme Court.[25] It is our duty to move forward in those areas of constitutional progress which we view as necessary to the development of a civilized way of life in Alaska. As Mr. Justice Cardozo observed,

"We take a false and one-sided view of history when we ignore its dynamic aspects. The year books can teach us how a principle or a rule had its beginnings. They cannot teach us that what was the beginning shall also be the end." Cardozo, The Growth of the Law, 104–105 (1924).

To the extent that the *Knudsen* case is inconsistent with our opinion today, it is overruled.

In interpreting the Alaska Constitution we must consider the consequences of denying jury trial to the person being prosecuted. It is of small moment to the citizen whether the period of incarceration is long or short; one day may be too long. Its results may be serious for one man and less so for another, depending upon a variety of circumstances. Furthermore, the great bulk of the citizenry encounters the judicial process most frequently in the prosecution of what have been called the petty offenses. Punishments inflicted at that level can be as harsh and as devastating to the life of the citizen as those meted out for more serious misdemeanors and for felonious conduct. Why should the remedial process be less just at one level than at another? We should be alert against attempts by government to whittle away fundamental rights on grounds of expediency. It is our constitutional duty to prevent such untoward consequences for the citizen at large. It is well stated in Duncan v. Louisiana, supra, that,

"Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the commonsense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge he was to have it." 391 U.S. at 156, 88 S.Ct. at 1451.

 Accordingly, we declare that in any criminal prosecution, whether under state law or for violation of a city ordinance, the accused upon demand is entitled to a jury trial. What is ultimately persuasive to us is the strong indication by other courts that fundamental fairness under the Fourteenth Amendment requires an extension of procedural safeguards in the administration of criminal justice to an area of crimes once deemed outside the pale of protection. In deciding today that appellant has a constitutional right to a jury trial, we have decided to so extend this protection. In doing so, we recognize that this result has not been reached in certain other jurisdictions or by the United States Supreme Court. The mere fact, however, that the United States Supreme Court has not extended the right to jury trial to all types of offenses does not preclude us from acting in this field. While we must enforce the minimum constitutional standards imposed upon us by the United States

---

25. Roberts v. State, 458 P.2d 340 (Alaska 1969).

Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage.[26] We need not stand by idly and passively, waiting for constitutional direction from the highest court of the land. Instead, we should be moving concurrently to develop and expound the principles embedded in our constitutional law.[27]

■ In extending the right to jury trial, we define the category of "criminal" prosecutions as including any offense a direct penalty for which may be incarceration in a jail or penal institution. It also includes offenses which may result in the loss of a valuable license, such as a driver's license or a license to pursue a common calling, occupation, or business.[28] It must also include offenses which, even if incarceration

is not a possible punishment, still connote criminal conduct in the traditional sense of the term.[29]

■ Excluded from the requirement of jury trial are such relatively innocuous offenses as wrongful parking of motor vehicles, minor traffic violations, and violations which relate to the regulation of property, sanitation, building codes, fire codes, and other legal measures which can be considered regulatory rather than criminal in their thrust, so long as incarceration is not one of the possible modes of punishment.

It is said that by allowing a broad right to jury trial too great a burden is imposed on the operation of government. But fears about the ramifications of constitutional decisions usually are not borne out in reality. Mr. Justice Cardozo wisely commented on such predictions of doom by observing that in making constitutional progress, "[w]e are to beware of the insularity of mind that perceives in every inroad upon habit a catastrophic revolution." Cardozo, The Paradoxes of Legal Science, 121

26. Roberts v. State, 458 P.2d 340, 342 (Alaska 1969). We again iterate our position, taken in Roberts, that "[w]e are not bound in expounding the Alaska Constitution's Declaration of Rights by the decisions of the United States Supreme Court, past or future, which expound identical or closely similar provisions of the United States Constitution."

We also again voice our disapproval of the language in Knudsen v. City of Anchorage, 358 P.2d 375 (Alaska 1960) which would indicate that we are bound by the United States Supreme Court's intepretation of the Sixth Amendment of the United States Constitution.

27. Other high state courts in interpreting their constitutions have anticipated or applied standards different from those minimally required by the United States Supreme Court. People v. Donovan, 13 N.Y.2d 148, 243 N.Y.S.2d 841, 193 N.E. 2d 628 (1963), extended the New York State constitutional right to counsel during police interrogation prior to the United States Supreme Court holding in Escobedo and Miranda; California, in People v. Cahan, 44 Cal.2d 434, 282 P. 2d 905, 915 (1955), adopted the exclu-

sionary rule prior to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, stating "In developing a rule of evidence applicable to the state courts, this court is not bound by the decisions that have applied the federal rule * * * "; in Perez v. Lippold, 32 Cal.2d 711, 198 P. 2d 17 (1948), the California court struck down a miscegenation law, thus anticipating by 19 years the United States Supreme Court's ruling in Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L. Ed.2d 1010 (1967).

28. This does not cover revocation of licenses pursuant to administrative proceedings where lawful criteria other than criminality are a proper concern in protecting public welfare and safety, as the basis of revocation or suspension in such instances is not that one has committed a criminal offense, but that the individual is not fit to be licensed, apart from considerations of only guilt or innocence of crime.

29. A heavy enough fine might also indicate criminality because it can be taken as a gauge of the ethical and social judgments of the community.

(1928). Furthermore, we need not rely only on speculation about the consequences of extending the right to jury trial. We have available empirical evidence which is of comfort. In jurisdictions such as California which provide jury trial for all offenses, regardless of type, no breakdown of the machinery of justice has occurred.[30]

We recognize that this decision represents an advance from what historically was thought by some to be the necessary extent of jury trial in criminal cases. But the evolving spirit of due process must be discerned and made effective as civilization advances. We reach a point when the crudities of an earlier time must be abandoned. In this dawning of the Age of Aquarius it is not too much to require that the right to jury trial shall be made available to everyone on equal terms as the plain constitutional language commands.

The decision below is reversed. This case is remanded with instructions to grant petitioner a jury trial.

---

30. Kalven and Zeisel, The American Jury 18–19 (1966).