PEOPLE v ANTKOVIAK

Docket No. 221743. Submitted February 1, 2000, at Grand Rapids. Decided
September 8, 2000, at 9:00 A.M.

Lawrence Antkoviak was convicted following a bench trial in the 89th
District Court, Harold A. Johnson, J., of the misdemeanor offense
of possession of alcohol by a minor and was assessed a fine and
costs. He was also convicted of the civil infraction of failure to
take a preliminary breath test and assessed a fine and costs. He
appealed to the Cheboygan Circuit Court with regard to the misde-
meanor conviction, asserting that the district court erred in deny-
ing his demand for a jury trial on the basis that conviction of the
offense cannot result in incarceration as punishment. The circuit
court, Scott L. Pavlich, J., reversed the conviction and remanded
the matter to the district court for a new trial, finding that there
was the potential for a substantial loss of liberty because a person
convicted of the offense could be ordered to perform many hours
of community service, undergo psychological and psychiatric evalu-
ations, and receive residential treatment. The prosecution appealed
by leave granted.

The Court of Appeals *held*:

1. The defendant preserved for appellate review the issue regard-
ing his right to a jury trial.

2. The phrase in Const 1963, art 1, § 20 that the right to a jury
trial exists "in every criminal prosecution" makes no distinction
between the seriousness of offenses, whether incarceration may or
may not be punishment for a conviction, or other considerations
that might otherwise support denying a jury trial to a defendant
charged with a misdemeanor. The 1963 constitution affords defend-
ants in misdemeanor cases the right to a jury trial.

3. The right to a jury trial in misdemeanor cases provided in the
1963 constitution is a continuation of more than one hundred years
of unbroken historical precedent in this state including the North-
west Ordinance of 1787 and the constitutions of 1835, 1850, and
1908.

4. Since the enactment of 1995 PA 122, a minor who possesses
alcohol is guilty of a misdemeanor and subject to fines that are no
longer designated as civil fines.

5. The Legislature clearly intended to prohibit a minor from possessing alcohol by making that conduct a criminal offense. A prosecution for such an offense is a criminal prosecution. Even though the offense is a petty offense and does not permit incarceration, the offense is a criminal misdemeanor, is subject to criminal prosecution, and carries with it a constitutional right to a jury trial. The order of the circuit court must be affirmed and the matter must be remanded to the district court for further proceedings.

Affirmed and remanded.

CRIMINAL LAW — CONSTITUTIONAL LAW — POSSESSION OF ALCOHOL BY A MINOR — JURY TRIALS.

Possession of alcohol by a minor is a criminal misdemeanor, a criminal offense the prosecution of which is a criminal prosecution that carries with it the right to a jury trial, even though the offense is a petty offense and does not permit incarceration upon conviction; the 1963 constitution affords defendants in misdemeanor cases the right to a jury trial, and the phrase in Const 1963, art 1, § 20 that the right to a jury trial exists "in every criminal prosecution" makes no distinction between the seriousness of criminal offenses or whether incarceration may be imposed upon conviction (MCL 436.1703[1][a]; MSA 18.1175[703][1][a]).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Timothy P. MacArthur*, Prosecuting Attorney, for the people.

*Daniel Martin*, for the defendant.

Amici Curiae:

*Judge Richard W. May*, for the 90th District Court.

*Brian Mackie*, President, *William A. Forsyth*, Kent County Prosecuting Attorney, *Timothy K. McMorrow*, Chief Appellate Attorney, and *T. Lynn Hopkins*, Assistant Prosecuting Attorney, for the Prosecuting Attorneys Association of Michigan.

Before: FITZGERALD, P.J., and SAAD and WHITBECK, JJ.

WHITBECK, J. The district court, after a bench trial, convicted defendant Lawrence Antkoviak (hereafter

Antkoviak) of the misdemeanor offense of possession of alcohol by a minor (we hereafter use the common name for this offense: minor in possession of alcohol), MCL 436.1703(1)(a); MSA 18.1175(703)(1)(a), and found him responsible for the civil infraction of refusing to perform a preliminary breath test, MCL 436.1703(5); MSA 18.1175(703)(5).[1] Antkoviak appealed his misdemeanor conviction to the circuit court asserting, as he did before the district court, that he was entitled to a jury trial for a violation of the minor in possession statute. The circuit court agreed and reversed his conviction. We granted the prosecutor's application for leave to appeal. We affirm and remand, but for reasons different from those that the circuit court enunciated.[2]

### I. BASIC FACTS AND PROCEDURAL HISTORY

The facts and the procedural history in this matter are simple and straightforward. In early November 1998, a Michigan State Police officer stopped Kristen Antkoviak, who is apparently Lawrence Antkoviak's sister, at 3:30 A.M. as she was driving south on M-27 in Cheboygan County. The trooper who stopped the car perceived a "moderate to strong" smell of alcohol and thought that defendant Antkoviak, a passenger in the

---

[1] The parties do not challenge the trial court's findings concerning the civil infraction.

[2] In addition to the prosecutor's and Antkoviak's briefs, we received very thoughtful amicus curiae briefs from Judge Richard W. May of the 90th District Court, the Prosecuting Attorneys Association of Michigan by Brian Mackie, the President of the Prosecuting Attorneys Association of Michigan, William A. Forsyth, the Kent County Prosecuting Attorney, Timothy K. McMorrow, Chief Appellate Attorney for Kent County, and T. Lynn Hopkins, Assistant Prosecuting Attorney for Kent County. We express our thanks to these individuals for their time and effort. These amici curiae briefs have been most helpful in this matter.

vehicle, spoke with a minimal slur while acting "slightly aggressive." Somehow, the trooper determined that defendant Antkoviak was under twenty-one years of age. These factors, along with the trooper's experience and the way Antkoviak's eyes looked, led the trooper to conclude that Antkoviak had been consuming alcohol illegally. The trooper, who did not find any evidence of alcohol in the vehicle, asked Antkoviak to submit to sobriety tests, including a preliminary breath test. When Antkoviak claimed that he had not been drinking and refused to perform a preliminary breath test, the trooper issued an appearance ticket to him for the offense of possession of alcohol by a minor.

The district court originally scheduled Antkoviak's case for jury selection in mid-December 1998. However, during a December 14, 1998, proceeding, the district court noted, sua sponte, that a person convicted of the misdemeanor of minor in possession of alcohol is not subject to incarceration. As a result, the district court concluded that the case was inappropriate for a jury trial and scheduled the case for a bench trial despite Antkoviak's objection.

On January 13, 1999, the district court held Antkoviak's bench trial for the minor in possession of alcohol charge and the preliminary breath test refusal citation. The prosecutor offered only the arresting trooper's testimony as evidence. Antkoviak presented no testimony, did not cross-examine the trooper, and rested after noting his continued objection to the district court's ruling denying him a jury trial. The district court subsequently issued a written opinion and order in which it again rejected Antkoviak's argument that he was entitled to a jury trial because conviction

of minor in possession of alcohol cannot result in incarceration as punishment. The district court also found Antkoviak guilty of the charge of minor in possession of alcohol and responsible for failing to take the preliminary breath test. Although the district court assessed fines and costs of $105 against Antkoviak for the misdemeanor conviction and $155 for the civil infraction, it stayed execution of the sentence so that Antkoviak could appeal to the circuit court.

The sole issue before the circuit court was whether the district court erred in denying Antkoviak a jury trial. In ruling on the merits of that argument, the circuit court first examined the portion of Const 1963, art 1, § 20 that states that "[i]n every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury . . . ." The circuit court did not examine the next phrase of that provision, which states that the impartial jury "may consist of less than 12 jurors in prosecutions for misdemeanors . . . ." Noting that both Antkoviak and the prosecutor relied on case law involving prosecution for traffic offenses variously labeled as misdemeanors and civil infractions, the circuit court then turned to the relevant text of the statute prohibiting minor in possession of alcohol statute, MCL 436.1703(1); MSA 18.1175(703)(1):

> A minor shall not purchase or attempt to purchase alcoholic liquor, consume or attempt to consume alcoholic liquor, or possess or attempt to possess alcoholic liquor, except as provided in this section. Notwithstanding section 909, a minor who violates this subsection is guilty of a misdemeanor punishable by the following fines and sanctions, and is not subject to the penalties prescribed in section 909:

(a) For the first violation a fine of not more than $100.00, and may be ordered to participate in substance abuse prevention or substance abuse treatment and rehabilitation services as defined in section 6107 of the public health code, 1978 PA 368, MCL 333.6107, and designated by the administrator of substance abuse services, and may be ordered to perform community service and to undergo substance abuse screening and assessment at his or her own expense as described in subsection (3).

The circuit court reasoned that the sanctions outlined in subsection a fell "somewhere between the civil infraction statute and traditional criminal law" because, even though the statute did not authorize incarceration, it permitted the trial court to order community service and substance abuse treatment. In concluding that subsection a "create[s] the potential for a substantial loss of liberty," the circuit court noted that (1) the Legislature could have made the offense a civil infraction, but maintained the offense as a misdemeanor, (2) conviction of a misdemeanor can have "stigma and effects" that are "substantial and long-lasting", (3) by allowing a trial court to order a defendant to engage in community service, the Legislature entrusted the courts with authority to compel a defendant's presence at "any number of various locales", and (4) the minor in possession of alcohol statute incorporates § 6107 of the Public Health Code, MCL 333.6107; MSA 14.15(6107), by reference, which in turn permits a court to order a wide range of services, including inpatient treatment. Accordingly, the circuit court concluded:

If a citizen exposed to a sentence of even one day in jail has the right to trial by jury, then it is only logical that a defendant exposed to many hours of community service, psychiatric and psychological evaluations, and residential

treatment would also be entitled to this constitutional safeguard.

The circuit court therefore reversed Antkoviak's conviction and remanded the matter to the district court for a new trial.

## II. PRESERVATION OF THE ISSUE AND STANDARD OF REVIEW

Antkoviak raised the issue of his right to a jury trial in the proceedings below and the district and circuit courts decided it, albeit in exactly contrary fashions. Antkoviak has therefore preserved the issue. *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994). Whether the 1963 Michigan Constitution permits a defendant to demand a jury trial for a misdemeanor charge presents a question of constitutional law that we review de novo. See *People v McRunels*, 237 Mich App 168, 171; 603 NW2d 95 (1999).

## III. FEDERAL VERSUS STATE CONSTITUTIONAL LAW: THE SIXTH AMENDMENT AND CONST 1963, ART 1, § 20

Although neither the district court nor the circuit court mentioned the federal constitution directly, the analysis each court engaged in referred obliquely to the case law interpreting the Sixth Amendment, which states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." As is apparent, the text of the Sixth Amendment is similar but not identical to Const 1963, art 1, § 20. Most significantly, the Sixth Amendment lacks the language referring to the number of jurors available in misdemeanor cases, which does appear in Const 1963, art 1, § 20.

Starting with the discussion in *Duncan v Louisiana*, 391 US 145, 159-162; 88 S Ct 1444; 20 L Ed 2d 491 (1968),[3] the United States Supreme Court concluded that the Sixth Amendment gives defendants in state courts the right to a jury trial, except for certain petty offenses. The definitive passage from the majority decision in *Duncan* stated:

> So-called petty offenses were tried without juries both in England and in the Colonies and have always been held to be exempt from the otherwise comprehensive language of the Sixth Amendment's jury trial provisions. There is no substantial evidence that the Framers intended to depart from this established common-law practice, and the possible consequences to defendants from convictions for petty offenses have been thought insufficient to outweigh the benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inexpensive non-jury adjudications. These same considerations compel the same result under the Fourteenth Amendment. Of course the boundaries of the petty offense category have always been ill-defined, if not ambulatory. In the absence of an explicit constitutional provision, the definitional task necessarily falls on the courts, which must either pass upon the validity of legislative attempts to identify those petty offenses which are exempt from jury trial or, where the legislature has not addressed itself to the problem, themselves face the question in the first instance. In either case it is necessary to draw a line in the spectrum of crime, separating petty from serious infractions. This process, although essential, cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little.

---

[3] In *Duncan's* companion case, *Bloom v Illinois*, 391 US 194; 88 S Ct 1477; 20 L Ed 2d 522 (1968), the Court held that sentences of up to six months' incarceration could be imposed for criminal contempt without a jury trial, but that a criminal conviction in a nonjury trial could not be sustained when the trial court imposed a twenty-four-month prison sentence.

> In determining whether the length of the authorized prison term or the seriousness of other punishment is enough in itself to require a jury trial, we are counseled by [*District of Columbia v Clawans*, 300 US 617; 57 S Ct 660; 81 L Ed 843 (1937)], to refer to objective criteria, chiefly the existing laws and practices in the Nation. In the federal system, petty offenses are defined as those punishable by no more than six months in prison and a $500 fine. In 49 of the 50 States crimes subject to trial without a jury, which occasionally include simple battery, are punishable by no more than one year in jail. Moreover, in the late 18th century in America crimes triable without a jury were for the most part punishable by no more than a six-month prison term, although there appear to have been exceptions to this rule. We need not, however, settle in this case the exact location of the line between petty offenses and serious crimes. It is sufficient for our purposes to hold that a crime punishable by two years in prison is, based on past and contemporary standards in this country, a serious crime and not a petty offense. [*Id.* at 160-162.]

*Duncan's* majority thus viewed the historical basis for this dichotomy between serious crimes and petty offenses as fairly well-settled. Even Justice Harlan, who dissented in *Duncan,* did so because he apparently believed that the majority had failed to acknowledge the full extent to which crimes were tried without a jury in England and early America. To make his point, Justice Harlan chronicled some of the crimes subject to "summary procedures" rather than jury trials. For instance, Justice Harlan observed that "British procedures" in effect in the American colonies permitted prosecutions for a multitude of offenses, including liquor law violations, smuggling, swearing, breaching the Sabbath, gambling, petty theft, assault, property offenses, and " 'at least a hundred more' " offenses without a jury. *Id.* at 191, quoting Frankfurter & Corcoran, *Petty federal offenses and the con-*

*stitutional guaranty of trial by jury*, 39 Harv L Rev 917, 928 (1926). Justice Harlan also commented that, as a matter of colonial law, not imposed by the British, prosecutions for crimes tried without a jury could result in stiff fines, imprisonment, hard labor, and corporal punishment if the defendant was convicted, even if the offenses were minor, such as vagrancy. *Duncan, supra* at 191-192.

Although the *Duncan* Court did not attempt to enumerate all the petty offenses free from the Sixth Amendment's jury trial guarantee, the Supreme Court continued exploring this area over the next twenty years. In *Baldwin v New York*, 399 US 66, 68-74; 90 S Ct 1886; 26 L Ed 2d 437 (1970), the Supreme Court explained that any crime that carries with it a potential sentence of six or more months' incarceration was *not* a petty offense and defendants charged with those crimes were entitled to a jury trial. *Blanton v North Las Vegas*, 489 US 538, 543; 109 S Ct 1289; 103 L Ed 2d 550 (1989), expanded that rule only slightly. Justice Marshall, writing for the unanimous *Blanton* Court, stated that a defendant accused of a crime that does not have a possible penalty of six or more months' incarceration is entitled to a jury trial "only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Id.* at 543. Thus, potential punishment, especially the duration of possible incarceration, is clearly the focal point when analyzing whether a defendant is entitled to a jury trial for a particular crime under the Sixth Amendment.

Given this well-developed federal precedent, and the absence of Michigan case law specifically accepting or rejecting the federal approach to determining the right to a jury trial under the Michigan Constitution, we understand why the district court and circuit court in this case focused on Antkoviak's potential for incarceration to determine if he was entitled to a jury trial. Similarly, we understand the conflicting propositions each party advances in this appeal. Stripped to its essence and reduced to a syllogism, the prosecutor and the amici curiae contend: *Major Premise*: The United States Supreme Court and, by analogy, the Michigan Supreme Court have established that there is no right to a jury trial for "petty offenses." *Minor Premise:* Minor in possession of alcohol is a petty offense. *Conclusion*: Therefore, there is no right to a jury trial for the offense of minor in possession of alcohol. Reduced to a syllogism, Antkoviak advances a competing approach to the problem in this case: *Major Premise*: The 1963 Michigan Constitution in art 1, § 20 provides that an accused in every criminal prosecution shall have the right to a speedy and public trial by an impartial jury. *Minor Premise:* The offense of minor in possession of alcohol is a misdemeanor and is subject to criminal prosecution. *Conclusion*: Therefore, there is a right to a jury trial for the offense of minor in possession of alcohol.

As Judge Ruggero Aldisert, a longtime member of the federal bench, points out in his book, Aldisert, Logic for Lawyers (Santa Barabara, Cal: Elm Spring Publishing Co, 1992), there is a considerable distinction between the *validity* of a syllogism and its *truth*. "The validity of a syllogism and the soundness of the

argument's structure deal only with relations between the premises. Validity deals only with form. It has absolutely nothing to do with content. Arguments, therefore, may be logically valid, yet absolutely non-sensical." *Id.* at 5-12. Here, neither the prosecutor nor Antkoviak advances an obviously untrue or nonsensical major premise. Rather, as is common in matters of some importance, there is some truth in *both* propositions. We therefore face the considerably more difficult task of exploring two *competing* truths in order to reach a conclusion that accords with the rules of constitutional interpretation.

Unlike the two lower courts, we do not begin our analysis, and the task of determining which party's truth reflects the law, by assuming that the federal analysis applies equally well under the 1963 Michigan Constitution. Rather, the initial question we address is whether Const 1963, art 1, § 20 and the Sixth Amendment afford the same right to a jury trial. A parallel question that we also address is to what extent, if any, these two separate documents overlap or diverge in the rights they confer. Only when we answer these questions can we analyze Antkoviak's claim that he was entitled to a jury trial for the minor in possession of alcohol charge.

### IV. INTERPRETING THE MICHIGAN CONSTITUTION

#### A. TEXTUAL ANALYSIS

When interpreting Const 1963, art 1, § 20, this Court's primary duty is to ascertain the provision's purpose and intent. See *White v Ann Arbor*, 406 Mich 554, 562; 281 NW2d 283 (1979). By intent, we mean the intent of the people who adopted the constitu-

tional provision at issue. *Straus v Governor*, 459 Mich
526, 533; 592 NW2d 53 (1999). As a result, our inter-
pretation should reflect the meaning that the people
themselves would apply. *Bolt v Lansing*, 459 Mich
152, 160; 587 NW2d 264 (1998). The clearest way to
ascertain this meaning is to look at the text's "natural,
common, and most obvious meaning, strictly con-
strued and limited to the objects fairly within its
terms, as gathered both from the section of which it
forms a part and a general purview of the whole con-
text." *Clearwater Twp v Kalkaska Co Bd of Supervi-
sors*, 187 Mich 516, 525; 153 NW 824 (1915).

### B. THE "COMPELLING REASON" STANDARD AND "A ROW OF SHADOWS"

The American system of government is unique in
that, questions of preemption aside, federal and state
law may completely converge, overlap to a limited
extent, or exist separately depending on the subject
matter. See *Sitz v Dep't of State Police*, 443 Mich 744,
762; 506 NW2d 209 (1993). That the text of the Sixth
Amendment and Const 1963, art 1, § 20 are so simi-
lar suggests that they might have some relationship
when it comes to defining the right to a jury trial
under our state constitution. Courts frequently view a
potential relationship between a right enumerated in
our state constitution and a similarly drafted federal
right to determine if the meaning of the state right
"departs" from the meaning of its federal counterpart.

This departure analysis, often called the "compel-
ling reason" standard, derives from the language in
Justice BRICKLEY's opinion in *People v Nash*, 418 Mich

196, 214; 341 NW2d 439 (1983).[4] There, the Supreme Court interpreted Const 1963, art 1, § 11 in light of the defendant's argument that the Michigan Constitution conferred greater protection from search and seizure than the Fourth Amendment. *Nash, supra* at 208. A majority of the justices agreed with Justice BRICKLEY's proposition that expanding the exclusionary rule beyond case law interpreting the Fourth Amendment "should occur only when there is a compelling reason to do so." *Id.* at 214.

Justice GRIFFIN subsequently elaborated on the compelling reason standard in *People v Collins*, 438 Mich 8, 32; 475 NW2d 684 (1991):

> We believe that [a] compelling reason for an independent state construction might be found if there were significant textual differences between parallel provisions of the state and federal constitutions, and, particularly, if history provided reason to believe that those who framed and adopted the state provision had a different purpose in mind.

Thus, although appearing restrictive on its face, this compelling reason standard does contemplate occasions when the Michigan Constitution will afford greater rights than the federal constitution.

Indisputably, state courts are free to interpret rights in state constitutions differently than federal courts interpret similar federal constitutional rights. See *Sitz, supra* at 759-760 (discussing Supremacy Clause, US Const, art VI, cl 2). While the federal courts can legitimately instruct state institutions on

---

[4] This concept existed in the case law before Justice BRICKLEY used the compelling reason language in *Nash*. See, e.g., *People v Beavers*, 393 Mich 554, 566-567; 227 NW2d 511 (1975); *People v Victor*, 287 Mich 506, 549-550; 283 NW 666 (1939).

the meaning and effect of federal law, state courts, especially the Michigan Supreme Court, have "the ultimate responsibility for determining a question of state law." *In re Apportionment of State Legislature—1982*, 413 Mich 96, 116, n 11; 321 NW2d 565 (1982). As the Michigan Supreme Court explained in *Sitz, supra* at 758-759, the

> "compelling reason" [standard] should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law. . . . Properly understood, the *Nash* rule compels neither the acceptance of federal interpretation nor its rejection. In each instance, what is required of this Court is a searching examination to discover what law "the people have made." *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884).

By permitting, but not absolutely requiring, parallel interpretations of state and federal constitutional rights, the compelling reason standard acknowledges that the analysis should be unique to the right being examined. In this way, courts avoid a phenomenon that now United States Supreme Court Justice Souter recognized in his concurrence in *State v Bradberry*, 129 NH 68; 552 A2d 1380 (1986), when he was a member of the New Hampshire Supreme Court. Confronting the defendant's inadequate development of an argument on state constitutional grounds, he wrote, "If we place too much reliance on federal precedent we will render the State rules a mere row of shadows; if we place too little, we will render State practice incoherent." *Id.* at 83; see also Williams, *In the glare of the Supreme Court: Continuing methodology and legitimacy problems in independent state constitutional rights adjudication*, 72 Notre Dame L R 1015, 1048 (1997). As a result of this phenome-

non, it should come as no surprise that while courts have used the compelling reason standard since *Nash* to conclude that federal doctrine controls some state rights, passionate debate concerning the wisdom of using this standard to justify parallel interpretations has developed as well. Compare, for example, Justice BOYLE's ferocious dissent in *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996), with Justice CAVANAGH's reasoning for the majority in *People v Bullock*, 440 Mich 15, 27-29; 485 NW2d 866 (1992).

With this tension in mind, we note that case law relies on the compelling reason standard to apply Sixth Amendment doctrine to the state constitutional right to counsel, which is also embodied in Const 1963, art 1, § 20. See, e.g., *People v Reichenbach*, 459 Mich 109, 118-119; 587 NW2d 1 (1998); *People v Pickens*, 446 Mich 298, 326; 521 NW2d 797 (1994). However, because the right to counsel is wholly distinct from the right to a jury trial,[5] those opinions do not control our analysis in this case. Our basic responsibility, therefore, is to conduct a searching examination of the right to a jury trial guaranteed in Const 1963, art 1, § 20 to determine the law "the people have made." *Harding, supra* at 485. We do this by examining the language used in the provision and then reviewing its historical roots. *Collins, supra; Pickens, supra* at 310.

### V. THE LAW THE PEOPLE HAVE MADE

#### A. THE CURRENT TEXT

The key phrase in Const 1963, art 1, § 20 is that the right to a jury trial exists "[i]n every criminal pros-

---

[5] See n 6, *infra.*

ecution . . . ." It is plain to us that the expansive language makes no distinction between more or less serious offenses, crimes for which incarceration may or may not be punishment, or other considerations that might otherwise deny a defendant charged with a misdemeanor a jury trial.[6] Indeed, the statement in art 1, § 20 that an "accused" prosecuted for a misdemeanor "punishable by imprisonment for not more than 1 year" is entitled to a jury that may "consist of less than 12 jurors" explicitly requires prosecutions conducted while the 1963 constitution is in effect to afford defendants in misdemeanor cases the right to a jury trial. Stated another way, if defendants in misdemeanor cases were *not* entitled to a jury trial, then prescribing the number of jurors that may sit in judgment in those cases would be unnecessary. In sum, there is no indication that the people who ratified the 1963 constitution intended anything other than the plain words in art 1, § 20 and, as the following historical exploration strongly suggests, the right to a jury trial in this most recent constitution is a continuation of unbroken historical precedent in this state.

---

[6] To the contrary, the Michigan Supreme Court has implicitly found that the words "in every criminal prosecution" do not apply to the right to counsel guaranteed in Const 1963, art 1, § 20 by adhering to the federal precedent holding that the right to counsel applies only when a defendant is actually imprisoned. See, generally, *Reichenbach, supra* at 115-118. The right to counsel and the right to a trial by jury are, however, distinct and the analysis of one should not shape the analysis of the other. Indeed, there is a significant difference in the way that the right to trial counsel depends on *actual* incarceration while, at least under Sixth Amendment precedent, the right to a jury depends on the *potential* for incarceration. See *Blanton, supra* at 543; *Argersinger v Hamlin,* 407 US 25, 40; 92 S Ct 2006; 32 L Ed 2d 530 (1972); *Baldwin, supra* at 68-74.

B. ENGLISH AND EARLY AMERICAN ROOTS OF THE CURRENT TEXT

The right to a trial by a jury is one of the lodestar concepts of Anglo-American jurisprudence and has historical roots that grow as deep as the Magna Carta of 1215. That document said, in § 39, "No freeman shall be taken or imprisoned, or disseised, or outlawed, or banished, or any ways destroyed, nor will we pass upon him, nor will we send upon him, unless by the lawful judgment of his peers, or by the law of the land." Whether that original form of trial was substantially equivalent to a modern jury that renders a "verdict on the facts of 'twelve good men and true,' " is debatable. See *Baker v Fairbanks*, 471 P2d 386, 396, n 16 (Alas, 1970), citing Frankfurter & Corcoran, *supra*; see also *McRae v Grand Rapids, L & D R Co*, 93 Mich 399, 403; 53 NW 561 (1892). However, this modern concept of a jury "can be observed in ordinary criminal trials by at least the beginning of the 1300's." *Baker, supra* at 396, n 16, citing Frankfurter & Cocoran, *supra* at 923.

Blackstone commented that the right to a jury trial was originally intended to check the power of the monarch:

"Our law has therefore wisely placed this strong and two-fold barrier, of a presentment *and a trial by jury*, between the liberties of the people and the prerogative of the crown. It was necessary, for preserving the admirable balance of our constitution, to vest the executive power of the laws in the prince: and yet this power might be dangerous and destructive to that very constitution, if exerted without check or control, by justices of oyer and terminer occasionally named by the crown: who might then, as in France or Turkey, imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the

English law have, with excellent forecast, contrived that . . . ." the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of *twelve of his equals and neighboors*, indifferently chosen and superior to all suspicion." [4 Blackstone Comm 349-350 (Cooley ed, 1899), quoted with alterations in *Baker, supra* at 396-397 (emphasis supplied).]

Justice White, when writing for the majority in *Duncan, supra,* traced this important jury trial right as it crossed the Atlantic with the original English colonists who settled in America, manifesting itself again through the words of the colonial Stamp Act Congress, which declared that " 'trial by jury is the inherent and invaluable right of every British subject in these colonies.' " *Duncan, supra* at 152. In 1774, the First Continental Congress echoed this same principle, stating " '[t]hat the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law.' " *Id.* Even the Declaration of Independence mentioned, among the many grievances the colonists had, that the King had deprived them of the right to a jury trial. *Id.*

Ultimately transformed by the Revolutionary War and America's independence, the right to a jury trial became not a check against the power of the English throne, but a check against the power of the state. The federal constitution mentions this right not once, but twice. US Const, art III, § 2, cl 3 notes, "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crime shall have been committed . . . ." The Bill of Rights was originally drafted, in part, to

persuade states to adopt the constitution in place of the relatively weak Articles of Confederation, which did not provide for a judiciary. See, generally, Kaminski, *Restoring The grand security: The debate over a federal bill of rights, 1787-1792*, 33 Santa Clara L R 887, 887-888, 890 (1993). In order to underscore the individual protections available under a government established by the constitution, the Bill of Rights listed numerous rights, including the Sixth Amendment guarantee of the right to a speedy and public trial by an impartial jury in all criminal prosecutions.[7] See *id.* at 891-895.

This postcolonial development and differing application of the right to a jury trial in misdemeanor and felony cases presents almost endless opportunities for study and debate. However, our real interest here is in how the right to a jury trial manifested itself once the concept spread west, to Michigan.

### C. TRIAL BY JURY IN THE MICHIGAN TERRITORY

Fifty years before Michigan became a state, and at the same time the Constitutional Convention met in Philadelphia, the Northwest Ordinance of 1787 governed a wilderness area on what was then the western part of the United States, a portion of which eventually became the Michigan Territory. See Blume, *Transactions of the Supreme Court of the Territory of Michigan, 1805-1814*, vol I at xix (Blume). The Northwest Ordinance, § 14, art II, stated in part:

---

[7] According to Kaminski, *supra* at 919, the United States Senate eliminated a specific provision in the Bill of Rights that would have required the individual states to guarantee the right to a jury trial, even before the Fourteenth Amendment was adopted.

The inhabitants of the said territory shall always be enti-
tled to the benefits of the writs of habeas corpus, *and of the
trial by jury* . . . . No man shall be deprived of his liberty or
property, *but by the judgment of his peers*, or the law of
the land . . . ." [Emphasis supplied.]

That this provision applied to lesser offenses in the
Michigan Territory, perhaps more broadly than in
other states or in England, is no coincidence. Chief
Justice CAMPBELL explained our somewhat individual-
istic trend more than a century ago:

The relations of this commonwealth [Michigan] to the
common law are not altogether conformed to the holdings
of some other states. In many of the states, statutes of par-
liament passed before or during the early days of the Amer-
ican colonies, as well as old colonial statutes and usages,
have been recognized as part of the local common law, and
have been construed and applied by the courts. But Michi-
gan was never a common-law colony, and while we have
recognized the common law as adopted into our jurispru-
dence, it is the English common law, unaffected by statute.
[*In re Lamphere*, 61 Mich 105, 108; 27 NW 882 (1886).]

Thus, when we read the very earliest case reports
from the Michigan Territory, we come across cases
involving crimes that would, undeniably, be consid-
ered misdemeanors or "petty" offenses under English
or early American common law that were, neverthe-
less, tried to a jury when committed here.

The 1806 cases of *United States v Muir, United
States v Lundie,*[8] *United States v Brevoort,*[9] and
*United States v Hanks*, reported in Blume, *supra*, vol
I at 58-63, 358-364, are instructive. In 1805, Captain

---

[8] His name is variously spelled Lundi, Lundie, and Lundee.

[9] Also spelled Brevort and Brevote.

Adam Muir, Ensign John Stow Lundie, Lieutenant Henry Brevoort, and Lieutenant Porter Hanks, who were British[10] army officers, attempted to capture two British deserters, one named Morrison, who were in the Michigan Territory. *Id.* at 59, 63, 359; Letter to Stanley Griswold, Acting as Governor of the Territory of Michigan, from James Abbott and William M'Scote,[11] December 14, 1805, reprinted in Blume, *supra*, vol II at 88-89. When the British officers found Morrison, Thomas Nowlan,[12] evidently a Michigan Territory resident with no overwhelming love for the British, was able to obtain sufficient assistance to take Morrison safely to Detroit. *Id.*, vol II at 89. Muir, Brevoort, and Lundie, however, learned where Morrison was being held and they "rushed violently into the house of Conrad Sick, a citizen of the United States, armed with swords and pistols, which they presented to the family, and laid hold of the aforesaid Morrison the British deserter, and dragged him forcibly out of the house . . . ." *Id.* In the ensuing melee, Muir threatened to shoot Morrison, but accidentally shot himself, and Lundie and Sick scuffled while

> Brevort [sic] used the most threatening language against any of the citizens who should offer to oppose or resist them—that young Mr[.] Hull spread the alarm, while lieut. Hanks stepped forward and afforded them protection, by lifting his stick and calling on the citizens to come on, and shew [sic] who of them dared to touch them . . . . [*Id.*]

---

[10] A letter from James Abbott and William M'Scote to Stanley Griswold, acting as Governor of the Territory of Michigan, suggests that Brevoort was a lieutenant in the American army. Blume, *supra*, vol II at 89.

[11] Evidently, William McDowell Scott who, as counsel for the marshal, likely acted as a prosecutor in this case. Blume, *supra*, vol I at 358.

[12] Also spelled Nowland.

The crowd was eventually able to take Morrison away and the marshal arrested Muir, Lundie, Brevoort, and Hanks. *Id.*

Muir, Lundie, Brevoort, and Hanks were all charged with assault and battery for their conduct. *Id.*, vol I at 58-62, and vol II at 90-93. "At common law assault and battery were misdemeanors." *People v Johnson,* 407 Mich 196, 220; 284 NW2d 718 (1979). Even though case reporting was in its infancy at that time, and a rough art at best, Michigan Territory Chief Justice Augustus B. Woodward's journal entry for September 18, 1805, reprinted in Blume, *supra,* vol I at 358, clearly states that the three-member court ordered the marshal to gather a jury for the trial. Hanks pleaded guilty of the charges against him, making a jury unnecessary in his case. *Id.* at 360. However, Muir, Lundie, and Brevoort pleaded not guilty, so "the [twelve-man] Jury Summoned by the Marshall . . . who being elected, tried and Sworn, to try the issue joined retired to Consider of their verdict, and after Some time returned into court, and upon their oath did find that the three respondents are guilty." *Id.* at 359.

The Michigan Territory's Supreme Court did not offer a jury as a special privilege in these cases because they involved a politically sensitive situation.[13] A twelve-man jury sat in judgment of numerous other cases involving assault and battery during the same time. See, e.g., Blume, *supra,* vol I at 132-134, 443-444. A twelve-man jury was also impaneled for at

---

[13] "The acting governor considered the transaction 'an *open insult* upon the government, and an *act of hostility* on the part of the British concerned,' and reported the matter to Secretary Madison." Blume, *supra,* vol I at 59.

least one trial in 1808 in which the defendant was charged with keeping a "disorderly house," meaning a house of ill repute. See *United States v Fournier*, reprinted in Blume, *supra*, vol I at 134, 442-443. Later case law strongly suggested that this offense was a misdemeanor. See *Slaughter v People*, 2 Doug 334, 336-338 (1842); see also *Welch v Stowell*, 2 Doug 332 (1846).[14]

Certainly a minor in possession of alcohol misdemeanor may not be considered as "serious" as assault and battery for any number of reasons, especially when viewed from the perspective of those who lived two hundred years ago. For example, the minor in possession of alcohol offense does not necessarily involve physical harm while assault and battery can involve quite significant physical harm. Social attitudes concerning young drinkers may also have been very different in previous eras, affecting whether it was a crime for a minor to possess alcohol. Similarly, keeping a disorderly house may have had a far wider effect on a community than a minor possessing alcohol, making it a more serious offense than the misdemeanor we address in this case. Despite these distinguishing characteristics, the important lesson from these early cases is that the concept of trying a misdemeanor case to a jury was familiar to the people who settled the territory that eventually became our state.

---

[14] Note, also, that the Supreme Court was the highest of three levels of courts in the Michigan Territory, with the Justice of the Peace Courts at the bottom, and the District Courts between the two, while the territory was not occupied by the British. See Blume, *supra*, vol I at 9-13. We cannot be certain whether these other courts were conducting jury trials for misdemeanor cases.

### D. THE 1835 CONSTITUTION

The next significant manifestation of the right to a jury trial appeared in two separate places in the constitution of 1835, two years before Michigan became a state. Article 1, § 9 of the 1835 constitution stated simply and without reservation that "[t]he right of trial by jury shall remain inviolate." The 1835 constitution further explained that right in art 1, § 10, which read:

> In all criminal prosecutions, the accused shall have the right to a speedy and public trial by an impartial jury of the vicinage . . . and in all civil cases, in which personal liberty may be involved, the trial by jury shall not be refused.

By using such plain and unequivocal language, this original constitutional scheme created the broadest possible right to a jury trial. The plain language extends this right to "criminal prosecutions," including civil cases affecting potential loss of personal liberty.[15]

Construing Const 1835, art 1, §§ 9 and 10 to provide the right to a jury trial for misdemeanors is compatible with what we know about early trial practices in the Michigan Territory. Even if the case reports for those very early years predating the first constitution did not give a complete picture of which offenses were submitted to a jury, the people of the Michigan Territory who adopted the constitution made the law conform to this practice of juries in misdemeanor

---

[15] The 1835 constitution did not guarantee the right to be free from incarceration for violating private rights, such as when a party breached a contract or incurred a debt. That right first appeared in Const 1850, art 6, § 33 and likely accounts for this blurred line between civil and criminal cases.

cases. In effect, by adopting the 1835 constitution, the people rejected all earlier precedents and practices that were inconsistent with its text. See *Stout v Keyes*, 2 Doug 184, 189 (1845) ("[S]o far as the constitution and the government established by it, or the provisions of statutes, are inconsistent with, or repugnant to the common law, they supersede it.").

The Michigan Territory's courts enforced this principle of following the new law they had made with the 1835 constitution, even if it differed from other jurisdictions. For example, in *Slaughter, supra,* Justice WHIPPLE distinguished Michigan's requirement that a person charged with a felony or misdemeanor be indicted by a grand jury under the 1835 constitution from the federal constitutional requirement that did not extend the right to this form of indictment to misdemeanors. Among the various reasons Justice WHIPPLE cited for Michigan's departure from the federal precedent, he noted that "[t]he ancient rule with respect to the distinction between felonies and misdemeanors, has given place to another more enlightened and just," which treated both as "crimes" under the state constitution. *Slaughter, supra* at 338. Furthermore, Justice WHIPPLE noted that "[i]n the most modern of the constitutions of the states of the Union, there is a manifest inclination, not merely to enlarge, but to guard with great strictness the liberties of the citizen." *Id.* In the end, the Court enforced the 1835 constitution strictly as written and reversed the defendant's conviction of keeping a disorderly house despite federal precedent that would have reached the opposite result.

Although made in a different context, Justice WHIPPLE's reasoning is important to this case. His

analysis made clear that both felonies and misdemeanors are "crimes" as that word was used in the 1835 constitution despite any difference existing at common law or in previous practice in America. See also *People v Hanrahan*, 75 Mich 611, 619-620; 42 NW 1124 (1889). Justice WHIPPLE also suggested that Michigan's Constitution both was broader than others in existence at that time, including the federal constitution, and also gave great emphasis to ensuring individual rights. Thus, by saying that "[t]he right of trial by jury shall remain inviolate" in art 1, § 9, and then using the words "criminal prosecutions," rather than simply specifying felonies in art 1, § 10, the 1835 constitution undoubtedly extended the right to a jury trial to defendants accused of misdemeanors.

### E. THE 1850 CONSTITUTION

Thirteen short years after statehood, the people of Michigan adopted a new constitution, which dealt with the right to a jury trial differently than the 1835 Constitution. The 1850 constitution no longer encompassed a statement that the right to a jury trial would remain "inviolate." Instead of a single section defining that right to a jury trial, like in Const 1835, art 1, § 9, the 1850 constitution split the right to a jury trial into three separate sections. Those three sections appeared not in an article called the state Bill of Rights, as they had in the 1835 constitution, but in the article governing the courts; the 1850 constitution lacked an article solely dedicated to enumerating individual rights.

The first place the right to a jury trial appeared in the 1850 constitution was in art 6, § 25, which pro-

vided the right to a jury trial in cases alleging libel, saying:

> In all prosecutions for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. The jury shall have the right to determine the law and the fact.

Next, in art 6, § 27, the 1850 constitution separately addressed juries in civil cases, stating, "The right of trial by jury shall remain, but shall be deemed to be waived in all civil cases unless demanded by one of the parties in such manner as shall be prescribed by law." Finally, Const 1850, art 6, § 28 provided:

> In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury, which may consist of less than twelve men in all courts not of record . . . .

This was a slight variation of Const 1835, art 1, § 10, substituting the word "every" for the word "all" when referring to criminal prosecutions and enumerating, for the first time, the permissible numbers of jurors in a criminal case tried in courts other than the Supreme Court, circuit courts, and probate courts. See Const 1850, art 4, § 46 and art 6, § 15.

Given this change in the language and format of the right to a jury trial in the 1850 constitution, the natural question is whether the right to a jury trial in criminal cases became stronger, weaker, or remained substantially similar to the right as described in the previous constitution. Some might argue that the 1850 constitution weakened the right to a jury trial by removing the flat statement that the right, no matter

the type of action, "shall remain inviolate." But several factors suggest that the 1850 constitution maintained or strengthened the right to a jury trial in all criminal cases, including misdemeanor cases.

First, there is evidence that by not including the "shall remain inviolate" language in the 1850 constitution, the framers were reacting to changes in the right to a jury trial in civil cases, which had been controversial, and were not attempting to change the right in criminal trials. See *People v Bigge*, 288 Mich 417; 422-423; 285 NW 5 (1939). The 1835 constitution lacked language specifically extending the right to a jury trial in *all* civil cases, rather than only those potentially affecting personal liberty. Presumably, the right to a jury trial in civil cases not affecting personal liberty derived from the unclassified "shall remain inviolate" language in Const 1835, art 1, § 9.[16] Regardless of its source, the right to a jury trial in civil cases unquestionably existed under the first constitution because the 1850 constitution noted that the right "shall remain" in civil cases. Const 1850, art 6, § 27. The 1850 constitution then substantially altered this access to a jury trial in civil cases, making it a matter of election rather than right. *Id.*

Although the "shall remain inviolate" language would have been consistent with the absolute right to a jury trial in libel and criminal cases, see Const 1850, art 6, §§ 25, 28, it would have been in direct conflict with this new civil jury trial provision. Had the 1850 constitution continued to say that the right to a jury trial was "inviolate," meaning "undisturbed," "unbro-

---

[16] Not all civil cases were entitled to a jury. See, e.g., *Michigan v Iron Cliffs Co*, 54 Mich 350; 20 NW 493 (1884) (equitable actions).

ken," or "not infringed," the parties in civil cases were likely to challenge whether they "waived" a jury by failing to demand one as prescribed by law pursuant to the plain language of Const 1850, art 6, § 27. See *Random House Webster's College Dictionary* (2d ed, 1977) (defining inviolate). This conflict would have created significant problems for the courts, which must attempt to interpret separate provisions in the same constitution so that they do not conflict. As we said in *Durant v Dep't of Ed (On Second Remand)*, 186 Mich App 83, 115; 463 NW2d 461 (1990), "[N]o fundamental constitutional principle shall be construed so as to nullify or substantially impair another, all fundamental constitutional principles being of equal dignity." This need to avoid conflict appears to be the most plausible explanation for why the "shall remain inviolate" language was not included in the new 1850 constitution. This explanation does not, therefore, affect the strength of the right to a jury trial in criminal cases, whether for felonies or misdemeanors.

The second factor that persuades us that the right to a jury maintained its strength or grew stronger during this period is that, although Const 1850, art 6, § 28 prescribed that some courts could convene juries with fewer than twelve members, case law construing the right to a jury trial made the right absolute. In *People v Scott*, 56 Mich 154, 156; 22 NW 274 (1885), Chief Justice COOLEY referred to the prevailing view at the time that "it is not competent for an accused party to waive a constitutional right in a criminal case." See also *Swart v Kimball*, 43 Mich 443, 448; 5 NW 635 (1880). Michigan courts interpreted this to mean that a defendant in a criminal case could not

waive the right to a jury. See *People v Warren*, 122 Mich 504, 518; 81 NW 360 (1899); *People v Collison*, 85 Mich 105, 109; 48 NW 292 (1891); *Hill v People*, 16 Mich 351, 357 (1868). Thus, it would seem foreign to our ancestors that a criminal defendant would not only be in a position where he would have to demand a jury trial, rather than having one afforded automatically, but that a jury in a criminal trial could be denied under any circumstance.

The third factor that suggests that the right to a jury trial strengthened during this time is the proliferation of courts with criminal jurisdiction and the number of reported cases revealing that juries routinely decided misdemeanor cases in those courts. For instance, although Const 1835, art 6, § 6 created the justice of the peace courts (JP courts) in each township, the first constitution left the task of defining the "powers and duties" of the justices of the peace to the Legislature. Case reports for the fifteen years before the 1850 constitution was adopted were few and far between, now comprising only five slim volumes. Thus, it is difficult to gauge if and how frequently the JP courts used juries to decide misdemeanor cases from 1835 to 1850. However, after the people of Michigan adopted the 1850 constitution, the number of cases reported expanded significantly, as evidenced by the hundreds of volumes that now adorn the shelves of our law libraries. At the same time, Const 1850, art 6, § 18 specifically gave the JP courts jurisdiction over criminal cases. This fortuitous combination of increased case reporting and clear criminal jurisdiction in the JP courts reveals that, after 1850, misdemeanor cases were definitely tried to a

jury.[17] In fact, *People v Lane*, 124 Mich 271, 273-274; 82 NW 896 (1900), noted that 1897 CL 1024 and 1026 specifically provided for six-man jury trials in the JP courts, which evidently could be waived but not denied to a person accused of an offense. See also *People v Mangold*, 71 Mich 335, 338-339; 39 NW 6 (1888).

This right to a jury trial, even in the JP courts, which were not courts of record, was taken quite seriously. See Const 1850, art 6, § 15. In *People v Kennedy*, 58 Mich 372, 377; 25 NW 318 (1885), the defendant accused of the misdemeanor of selling liquor to an habitually intoxicated person demanded and was afforded a jury trial. Once convicted, the justice of the peace presiding over the trial imposed the per diem allowance given to each juror as part of the defendant's fine. *Id.* The Michigan Supreme Court reversed on other grounds, but noted, "It costs a litigant in a civil cause only three dollars for a jury trial, and *certainly it would be monstrous to establish a practice of punishing persons convicted of misdemeanors for demanding what the Constitution of the State gives them—a trial by jury.*" *Id.* (emphasis supplied).

The right to trial by jury for misdemeanor offenses was not limited to the JP courts. There are a great many reported cases from the circuit courts involving all variety of misdemeanors submitted to juries.[18] Sim-

---

[17] See, e.g., *People v Neal*, 143 Mich 271; 106 NW 857 (1906) (illegal fishing); *People v Barlow*, 134 Mich 394; 96 NW 482 (1903) (causing an indigent person to change place of residence); *People v Shufelt*, 61 Mich 237; 28 NW 79 (1886) (operating a saloon on Thanksgiving day).

[18] See, e.g., *People v Jewell*, 138 Mich 620; 101 NW 835 (1904) (carrying away public records); *People v Dornbos*, 127 Mich 136; 86 NW 529 (1901) (possession of fish in excess of amount prescribed by law); *People v*

ilarly, misdemeanors were tried to juries in the city courts that existed at the time.[19]

With these factors in mind, we are able to say with assurance that trying misdemeanors to a jury was a widespread practice while the 1850 constitution was in effect. *Kennedy, supra,* reveals that this right to a jury trial did not exist coincidentally, but actually flowed from the 1850 constitution itself. This literal interpretation of Const 1850, art 6, § 28 is quite logical given that the 1850 language providing the right to a jury trial in criminal cases was substantively unaltered from the original language in the 1835 constitution.

### F. THE 1908 CONSTITUTION

Through their plain language and the practices started under their auspices, the 1835 and 1850 constitutions provided the first two links in what had the potential to be an unbroken chain of state constitutional law providing the right to a trial by jury in misdemeanor cases. 1908 ushered in a modern era and with it, some might suspect, differences in the way

*Longwell,* 120 Mich 311; 79 NW 484 (1899) (druggist convicted of selling liquor to an intoxicated person); *People v Welmer,* 110 Mich 248; 68 NW 141 (1896) (jury convicted the defendants of a "local option" law); *People v Elmer,* 109 Mich 493; 67 NW 550 (1896) (fortune teller convicted of being a disorderly person); *People v Potter,* 89 Mich 353; 50 NW 994 (1891) (selling liquor on Sunday); *People v Phippin,* 70 Mich 6; 37 NW 888 (1888) (unauthorized practice of medicine).

[19] See, e.g., *People v Metzger,* 95 Mich 121; 54 NW 639 (1893) (jury in Detroit Recorder's Court convicted the defendant of failing to pay liquor tax); *People v Weithoff,* 93 Mich 631; 53 NW 784 (1892) (Detroit Recorder's Court conviction of keeping a gaming room); *People v Soule,* 74 Mich 250; 41 NW 908 (1889) (the defendant convicted by a jury in Grand Rapids Superior Court of selling liquor without paying tax); *People v Luby,* 56 Mich 551; 23 NW 218 (1885) (assault and battery conviction in Kalamazoo Recorder's Court).

society viewed the right to a jury trial. Quite remarkably, however, the 1908 constitution did not alter the right to a jury trial in any significant way. Although absent from the 1850 constitution, the 1908 constitution once again brought personal rights together, this time in article 2, the Declaration of Rights. See Const 1835, art 1 (Bill of Rights). Article 2, § 13 of the 1908 constitution provided the right to a jury trial in civil cases without altering a word from the original text in Const 1850, art 6, § 27. The 1908 constitution, art 2, § 18  kept the majority of the language concerning juries in libel cases, only striking what was the last sentence in Const 1850, art 6, § 25 giving the jury the right to decide the law. Most importantly, the language pertinent to a right to a jury trial in criminal cases did not change by even one word from the 1850 constitution. The 1908 constitution, art 2, § 19,  still provided:

> In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury, which may consist of less than twelve men in all courts not of record . . . .

See also Const 1908, art 5, § 27  permitting the Legislature to authorize juries with fewer than twelve men and art 7, § 17 defining courts of record.

Again, when we examine the case law as a whole, we see misdemeanors of every type, including the least serious, tried to juries while the 1908 constitution was in effect.[20] While defendants did obtain the

---

[20] See, e.g., *People v Edelsohn,* 323 Mich 469; 35 NW2d 389 (1949) (unlawful practice of dentistry prosecution in Detroit Recorder's Court); *People v Lippert,* 304 Mich 685; 8 NW2d 880 (1943) (gambling prosecution in circuit court); *People v Hope,* 297 Mich 115; 297 NW 206 (1941) (trial by

right to waive a jury trial, judicial pronouncements concerning the right to a jury trial while the 1908 constitution was in effect were as emphatic and unequivocal as ever. See *Attorney General ex rel O'Hara v Montgomery*, 275 Mich 504, 526-530; 267 NW 550 (1936). For instance, in *People v Hope*, 297 Mich 115, 118; 297 NW 206 (1941), the Supreme Court interpreted Const 1908, art 2, § 19 and wrote, "Every person charged with a criminal offense has a constitutional right to a trial by jury." The *Hope* Court made this statement without *any* qualification that it applied to certain offenses only. No statement could be more plain or require any less interpretation. Even so, we think it worth noting that *Hope* involved reckless driving, a misdemeanor. *Hope, supra* at 115-116.

Although not addressing the precise question raised in the instant appeal, *People v Medcoff*, 344 Mich 108, 114; 73 NW2d 537 (1955), proves as instructive here as *Hope; supra.* Following a raid on a gambling operation in Flint, the prosecutor charged the defendants in *Medcoff* with keeping and occupying a common gambling house, a misdemeanor. *Id.* at 110, 114. On the first day of trial, three prosecution witnesses, including the man who originally called the police, "seemed to be suffering from amnesia of some sort"

---

jury in JP court and retrial by jury in circuit court for reckless driving); *People v Jones*, 293 Mich 409; 292 NW 350 (1940) (assault and battery prosecution in Detroit Recorder's Court); *People v Ring*, 267 Mich 657; 255 NW 373 (1934) (indecent exposure prosecution in circuit court for operating a nudist camp); *People v Carr*, 231 Mich 246; 203 NW 948 (1925) (prosecution in JP court for unauthorized operation of a taxicab service); *People v Dehn*, 190 Mich 122; 155 NW 744 (1916) (prosecution in circuit court for selling adulterated sausage); *People v Damm*, 183 Mich 554; 149 NW 1002 (1914) (jury tried case in circuit court involving selling alcohol to students at the University of Michigan); *People v Osborn*, 170 Mich 143; 135 NW 921 (1912) (election law violation tried in circuit court).

and refused to identify the defendants. *Id.* at 110. The trial court ordered the three witnesses arrested for perjury. *Id.* On the second day of trial, defense counsel "stated that he had received information from a 'very reliable source' and 'from a member of the jury' that some members of the jury knew of the court's commitment of the 3 witnesses for perjury" and so moved for a mistrial. *Id.* at 111. The trial court denied the motion but, at defense counsel's urging, indicated that it would ask the jurors about the matter. *Id.* When the trial court asked the jurors about defense counsel's allegations, it did so without the prosecuting attorney, defense counsel, or defendants present. *Id.* at 112-113.

On appeal, the defendants in *Medcoff, supra,* argued that the trial court had violated their right to a public trial guaranteed by Const 1908, art 2, § 19. *Medcoff, supra* at 113. The Supreme Court rejected this argument, saying, rather, that it was "concerned with the right of trial by jury and its concomitant, the right of an accused to be present at such trial." *Id.* The Court, *id.* at 114, examined 1948 CL 768.3, which read:

> "No person indicted for a felony shall be tried unless personally present during the trial; *persons indicted or complained against for misdemeanors may,* at their own request, through an attorney, duly authorized for that purpose, by leave of the court, *be put on trial in their absence.*" [Emphasis supplied.]

The Court then reasoned:

> While some jurisdictions have distinguished between one accused of a felony or capital crime and one accused of a misdemeanor or non-capital crime for purposes of this

right, we think the fair implication of this statute is that a misdemeanant punishable by a maximum sentence of 2 years in the State prison, as well as a felon, is entitled to be present. *The aforementioned right to trial by an impartial jury, from which the right to be present is derived, applies to "every criminal prosecution."* [*Medcoff, supra* at 114 (emphasis supplied).]

*Medcoff* is instructive here because the Supreme Court, having noted a distinction between felonies and misdemeanors, could have made some comment on the right to a jury trial being contingent on the nature of the charges, but it did not do so. Although emphasizing the relative seriousness of the misdemeanors charged in the case, the *Medcoff* Court primarily relied on the introductory phrase in Const 1908, art 2, § 19 when concluding that the defendants had the right to be present at the hearing in question. In essence, the *Medcoff* Court ruled that the word "every" in Const 1908, art 2, § 19 meant that the rights enumerated in that section of the constitution applied as broadly as the plain language intimated. To the Supreme Court in *Medcoff*, "every" simply meant "every."

When we look back at the cases decided under the 1908 constitution, we see nothing unique in the way the right to a jury trial in criminal cases was articulated or in how that right was exercised in misdemeanor cases. The 1908 constitution added a third link in the lengthening chain of constitutional law providing the right to a trial by jury in misdemeanor cases in Michigan.

### G. THE 1963 CONSTITUTION IN ITS HISTORICAL CONTEXT

We commenced our analysis by examining the plain language of Const 1963, art 1, § 20 to ascertain the

plain meaning of the language as understood by the people who adopted it. We concluded that it clearly afforded the right to a jury trial to defendants charged with misdemeanors. Having examined the historical development of right to a jury trial in Michigan, we can now examine the differences between the 1908 and 1963 constitutions and how they relate to the issue at hand.

The 1963 constitution, in art 1, § 14, preserved with superficial linguistic changes the language in Const 1908, art 2, § 13 ensuring that the right to a jury trial "shall remain, but shall be deemed to be waived in all civil cases unless demanded by one of the parties in such manner as shall be prescribed by law" and added that the jury need not be unanimous in civil cases, but that "a verdict shall be received when 10 [of 12] jurors agree." The 1963 constitution also retained the jury provision in Const 1908, art 2, § 18 concerning libels, only making a superficial linguistic change concerning truth as a defense. See Const 1963, art 1, § 19.   The 1963 constitution did not change any of the language concerning the core right to a jury trial in criminal cases, which can be traced directly back to the 1850 constitution, which in turn incorporated only a minor stylistic change from the 1835 constitution. Const 1963, art 1, § 20 now reads:

> In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury, which may consist of less than 12 jurors in prosecutions for misdemeanors punishable by imprisonment for not more than 1 year . . . .

Only this last phrase concerning the number of jurors in misdemeanor cases, adopted as an amendment of

the 1963 constitution in 1972, is new. It replaced the language in Const 1908, art 2, § 19 providing that a jury "may consist of less than twelve men in all courts not of record." The reason for this change is relatively clear.[21] See 1972 House Joint Resolution M, ratified by the people at a special election on August 8, 1972. The 1963 constitution did away with the JP courts, the courts "not of record" specifically identified in earlier constitutions, which adjudicated relatively minor offenses like misdemeanors. Given the significant reorganization of the court system as a whole in article 6 of the 1963 constitution, the constitution's drafters chose the clearest way to express the principle that only these relatively less serious cases could be tried to a jury with fewer than twelve members by associating that right with the type of offense at issue rather than the forum in which it would be adjudicated.

We can find no evidence to contradict the plain language of Const 1963, art 1, § 20 and to indicate that the people of Michigan who ratified it intended to break with a jury trial tradition reflected in more than one hundred years of constitutional history. In fact, we must presume that they knew of this constitutional history when adopting this provision and that its similarity to Const 1908, art 2, § 19 is no coincidence. See *Jones v Ypsilanti*, 26 Mich App 574, 579-580; 182 NW2d 795 (1970). Although it is now easy to waive a jury trial in misdemeanor cases, the right to a jury trial has been no less strong under this most

---

[21] Const 1963, art 1, § 20 used the word "jurors" rather than "men" to reflect decisions extending the right to serve on a jury to women, which is insignificant to a criminal defendant's right to have a jury trial. See Address to the People, 2 Official Record of the 1961 Constitutional Convention, at 3364; *People v Barltz*, 212 Mich 580; 180 NW 423 (1920).

recent constitution than it was under previous constitutions. See MCL 763.3; MSA 28.856. The right to a jury trial is still so fundamental to our justice system that even the *prosecutor's* insistence on that form of trial may override a defendant's explicit jury waiver. See *People v Rodgers*, 180 Mich App 111, 116; 446 NW2d 845 (1989) (concluding in part that the "defendant did not have a substantive right to a nonjury trial" and that his "only constitutional right was to a jury trial").

### H. HISTORICAL CONCLUSIONS

The differences in the text between Const 1963, art 1, § 20 and the Sixth Amendment convince us that the plain language of the current Michigan Constitution provides the right to a jury trial in misdemeanor cases. To some extent, Michigan may have been a maverick when it came to providing and enforcing the right to a jury trial in misdemeanor cases, but it has done so widely and consistently since our first constitution.

We recognize, however, that courts in England and in other states, as well as the federal judiciary, have seen a distinction between "serious" crimes and "petty" offenses when extending the right to a jury trial. Thus, we must answer whether the Michigan Constitution affords the right to a jury trial in *all* misdemeanor cases, including those offenses that might be categorized as involving merely "petty" offenses.

### VI. THE "SERIOUS" VERSUS "PETTY" DICHOTOMY IN MICHIGAN CASE LAW

#### A. MINOR IN POSSESSION OF ALCOHOL AS A PETTY OFFENSE

In his perceptive amicus curiae brief, District Court Judge Richard W. May relies on a number of cases

involving contempt of court to support his view that a defendant is not entitled to a jury trial for a petty offense. Indeed, despite a Michigan Supreme Court ruling that there is no right to a jury trial in contempt cases, *Cross Co v UAW Local No 155 (AFL-CIO)*, 377 Mich 202; 139 NW2d 694 (1966), the United States Supreme Court has ruled that there is a federal constitutional right to a jury trial for serious criminal contempt, *Bloom v Illinois*, 391 US 194; 88 S Ct 1477; 20 L Ed 2d 522 (1968). Therefore, Michigan courts do apply the federal serious crime versus petty offense analysis when determining the right to a jury trial in this context. See *Ann Arbor v Danish News Co*, 139 Mich App 218, 233; 361 NW2d 772 (1984); *People v Goodman*, 17 Mich App 175, 178-179; 169 NW2d 120 (1969) ("Criminal contempt remains a 'petty' crime in Michigan, and a jury trial is not mandatory.").

By making this argument, Judge May asks us to accept the proposition that a minor who possesses alcohol in violation of MCL 436.1703(1); MSA 18.1175(703)(1) commits a petty offense rather than a serious crime, regardless of the Legislature's decision to call this offense a misdemeanor. As we explain below, although recent legislative action has made this a relatively more serious offense than it was from 1978 to 1995, when it was merely a civil infraction, minor in possession of alcohol is still a "petty" offense. Thus, we agree with Judge May, at least in part.

When the Legislature enacted the Liquor Control Act, MCL 436.1 *et seq.*; MSA 18.971 *et seq.*, in 1933, it simply prohibited licensed establishments from selling alcoholic liquor to people less than twenty-one

years old.[22] MCL 436.33; MSA 18.1004. The first major provision under the Liquor Control Act dealing with the legal consequences for minors who possessed alcohol came in 1969, when the Legislature added § 33b, MCL 436.33b; MSA 18.1004(2). See 1969 PA 68. Section 33b made it a misdemeanor for a "minor" to purchase or consume alcohol in a licensed establishment or simply to possess alcohol. Pursuant to MCL 750.504; MSA 28.772, a general penal statute for misdemeanors, a minor convicted of this misdemeanor offense could be punished by incarceration in jail for up to ninety days, a fine of not more than $100, or both.

The Legislature once again amended the Liquor Control Act in 1972, changing the age requirement in MCL 436.33b; MSA 18.1004(2) to eighteen, 1972 PA 13, before making more significant changes in 1978. 1978 PA 94 made it a misdemeanor for a person under the age of nineteen to purchase or consume alcohol in a licensed establishment or simply to possess alcohol. 1978 PA 531, however, increased the drinking age to twenty-one and changed the wording of MCL 436.33b(1); MSA 18.1004(2)(1) to prohibit a person under that age from "purchas[ing] alcoholic liquor, consum[ing] alcoholic liquor in a licensed premises, or possess[ing] alcoholic liquor . . . ." More significantly, 1978 PA 531 made it only a civil infraction for a person under twenty-one years of age to violate the Liquor Control Act, subject to a maximum $25 civil

---

[22] For pre-Prohibition laws concerning alcohol and minors, see, generally, *People v Thompson*, 161 Mich 391; 126 NW 466 (1910), *People v Bronner*, 145 Mich 399; 108 NW 672 (1906), *People v Neumann*, 85 Mich 98; 48 NW 290 (1891), *People v Welch*, 71 Mich 548; 39 NW 747 (1888), and *People v Garrett*, 68 Mich 487; 36 NW 234 (1888).

fine for a first violation, a maximum $50 civil fine or substance abuse counseling or both for a second violation, and a maximum $100 civil fine or substance abuse counseling or both for a third or subsequent violation.[23] See also *Craig v Larson*, 432 Mich 346, 358; 439 NW2d 899 (1989). Because the offense was a civil infraction at this time, and no longer designated a misdemeanor, a minor violating the statute could not be incarcerated or otherwise punished under MCL 750.504; MSA 28.772.

The 1986 amendment of the Liquor Control Act, 1986 PA 176, maintained the minor in possession of alcohol prohibition as a civil infraction for individuals under twenty-one years of age. *Starting in 1995, however, a minor who possessed, bought, or consumed alcohol, or attempted to do so, was guilty of a misdemeanor and subject to fines, which were no longer designated as civil fines.* See 1995 PA 122. For the first time, the statute permitted a trial court to sentence a minor to perform community service and sanction the minor's driver's license pursuant to MCL 436.33b(1); MSA 18.1004(2)(1) for a second or third offense. The statute continued to permit substance abuse screening and assessment, but increased the maximum dollar amount for the fines to $100 for a first offense, $200 for a second offense, and $500 for a third or subsequent offense. MCL 436.33b(1); MSA 18.1004(2)(1). However, because MCL 436.33b; MSA 18.1004(2), as it appeared after 1995 PA 122 amended it, excluded punishment under § 50 of the Liquor Con-

---

[23] This amendment gave the trial court the discretion to impose a civil fine, or substance abuse counseling, or both, for a second or third offense. Like its predecessors, the amended statute retained a number of exceptions.

trol Act, MCL 436.50; MSA 18.1021, the section proscribing punishment for other liquor violations, minors convicted under § 33b could not be incarcerated.

The Legislature repealed the Liquor Control Act in 1998 and, in its stead, enacted the Liquor Control Code, MCL 436.1101 *et seq.*; MSA 18.1175(101) *et seq.* See 1998 PA 58, eff April 14, 1998. *Like its immediate predecessor, the Liquor Control Code made it a misdemeanor for a minor to possess, consume, or purchase alcohol, or attempt to do so.* MCL 436.1703(1); MSA 18.1175(703)(1).[24] Because MCL 436.1703(1); MSA 18.1175(703)(1) specifically exempts minors from punishment under § 909 of the Liquor Control Code, MCL 436.1909; MSA 18.1175(909), minors, including Antkoviak, may not be incarcerated if convicted of this misdemeanor and may only be sentenced to the fines, community service, or substance abuse treatment referred to in the three subsections under MCL 436.1703(1); MSA 18.1175(703)(1).

At no time since the Legislature enacted the Liquor Control Act, MCL 436.1 *et seq.*; MSA 18.971 *et seq.*, in 1933 has a person convicted of this offense been at risk of incarceration exceeding six months in jail, the primary consideration under *Baldwin, supra.* This offense is less serious even when compared to other misdemeanors because, since the 1970s, a person convicted of this offense was subject only to the punishment listed in MCL 436.33b(1); MSA 18.1004(2)(1)

---

[24] Although the Legislature has further amended MCL 436.1703(1); MSA 18.1175(703)(1) since 1998, the changes to the statute do not substantively change it from the way it appeared at the time Antkoviak committed his alleged offense. See 1998 PA 353 and 1999 PA 53.

and MCL 436.1703(1); MSA 18.1175(703)(1). Other
misdemeanants can be sentenced under MCL 750.504;
 MSA 28.772, which permits fines up to twenty times
more severe than the one originally imposed in MCL
436.33b(1)(a); MSA 18.1004(2)(1)(a). Similarly, other
misdemeanants sentenced under MCL 750.504; MSA
28.772 can still be incarcerated for up to ninety days
in jail, while minors convicted of possessing alcohol
have not faced the possibility of any jail time in more
than twenty years.

The circuit court correctly observed that commu-
nity service and inpatient substance abuse therapy
both limit the liberty a minor convicted of possessing
alcohol would otherwise have. However, if we were
to follow the Sixth Amendment's dichotomy between
serious crimes and petty offenses in this case, we
would continue to conclude that this is a petty
offense because *Blanton, supra* at 543, requires evi-
dence that the penalties for violating the law be "so
severe that they clearly reflect a legislative determina-
tion that the offense in question is a 'serious' one."
While community service is, in a broad sense, puni-
tive, it is not naturally imposed on individuals who
commit serious offenses. Instead, community service
is viewed as a lesser sanction, with less of a stigma
than incarceration. Community service in lieu of
incarceration also permits a misdemeanant to remain
in the community, with the luxuries of home, work,
and family that are not available in jail. Certainly,
logic would hold that a person convicted of a serious
crime would neither be entitled to these luxuries nor
be necessarily trusted outside the jail's walls. Further,
substance abuse treatment is not necessarily punitive.
While it may place some restrictions on a person's

ability to choose what to do, where to be, and how to behave at any given time in a day, it does so in order to rehabilitate, not punish, an offender. Any restriction on liberty flowing from community service or substance abuse treatment is minimal and not evidence of the sort of legislative determination that an offense is serious that *Blanton* requires before affording a jury trial for crimes subjecting a person to less than six months' incarceration.

When reaching this conclusion that MCL 436.1703(1); MSA 18.1175(703)(1) describes a petty offense, we keep in mind that *Duncan* and its progeny do not require an offense to go *unpunished* in order to earn this designation. Nor do these other cases even hold that potential punishment must exclude incarceration, stiff fines, or other significant sanctions in order for an offense to be a petty one. Thus, when we look at the minor in possession of alcohol statute, we must agree that it falls at the very least serious end of a continuum judging the seriousness of an offense by its potential punishment. Nevertheless, and most importantly, concluding that a person who violates MCL 436.1703(1); MSA 18.1175(703)(1) commits a petty offense does *not* clarify whether this petty versus serious dichotomy in contempt case law has any bearing on how Michigan law views the right to a jury trial for misdemeanors.

### B. DISTINGUISHING THE CONTEMPT CASES

As we noted above, Michigan courts have not directly recognized a right to a jury trial in contempt cases under the Michigan Constitution. See, generally, *People v Johns*, 384 Mich 325, 330; 183 NW2d 216 (1971) (Court never addressed whether there is a

right to a jury trial in a criminal case); *People v McCartney*, 132 Mich App 547, 550-552; 348 NW2d 692 (1984) (failing to list a jury trial as a right in a criminal contempt case). Despite our conclusion that a minor possessing alcohol commits a petty offense and, therefore would not be entitled to a jury trial under Sixth Amendment analysis, the contempt cases do not bind our decision in this case because contempt cases are distinguishable on significant grounds from other, even petty, offenses.

In *Cross Co, supra* at 211, in which the Supreme Court declined to extend the right to a jury trial to contempt cases, the Court still commented that contempt proceedings are an "anomaly." As a procedure designed to "vindicate the power and authority of a court," *id.*, contempt proceedings have a unique basis in the law. Committing contempt is substantially different from violating a statute enacted by the Legislature to prohibit conduct that is *malum in se* because it is naturally evil or immoral, like murder. There is nothing intrinsically evil about, for example, refusing to answer a question posed by a grand jury. A court may, nevertheless, have a legitimate need to compel the testimony and, as a result, properly exercise its power to hold the reluctant witness in contempt until he answers. See, generally, *In re Contempt of United Stationers Supply Co*, 239 Mich App 496, 499-501; 608 NW2d 105 (2000) (describing civil and criminal contempt). Similarly, committing contempt is different from violating a statute that proscribes particular conduct because it is unwise under legitimate views of public policy and therefore *malum prohibitum*, like the offense at issue in this case. A court's ability to prevent future unwarranted interruptions in its proce-

dures may benefit parties seeking justice and have some contingent effect on society. *Id.* However, unlike the legislative process, courts do not invite comment, go through an in-depth debate process, and ultimately attempt to focus on the needs of society at large before determining when to enforce specific standards of conduct.

Moreover, contempt cases are not precisely criminal cases. As Justice CAVANAGH noted in *In re Contempt of Dougherty*, 429 Mich 81, 90-91; 413 NW2d 392 (1987), quoting *Andreano v Utterback*, 202 Iowa 570, 571; 210 NW 780 (1926), a " 'contempt proceeding occupies what may be termed the twilight zone between civil and criminal cases . . . .' " In contrast, a person who violates MCL 436.1703(1); MSA 18.1175(703)(1) plainly commits a crime. MCL 750.5; MSA 28.195 defines the word "crime" as

> an act or omission forbidden by law which is not designated as a civil infraction, and which is punishable upon conviction by any 1 or more of the following:
>   (a) Imprisonment.
>   (b) Fine not designated a civil fine.
>   (c) Removal from office.
>   (d) Disqualification to hold an office of trust, honor, or profit under the state.
>   (e) Other penal discipline.

MCL 436.1703(1); MSA 18.1175(703)(1) clearly forbids a minor to possess alcohol, and the fine it authorizes is not a "civil fine." The statute does permit the court to impose conditions that, although not equivalent to incarceration, fall under the broad category of "other penal discipline." While this was a civil infraction for a period starting in 1978, that is no longer true. The proceeding that follows a violation of this statute is

wholly a criminal prosecution and not some hybrid between a criminal and civil proceeding, as in contempt cases. See *People v Webb*, 75 Mich App 494, 499; 255 NW2d 661 (1977), quoting *People v Ellis*, 204 Mich 157, 161; 169 NW 930 (1918) (" 'A prosecution is generally understood to be a criminal action; a proceeding instituted and carried on by due course of law before a competent tribunal for the purpose of determining the guilt or innocence of the person charged with some crime or offense.' ").

In sum, we understand that the Sixth Amendment establishes the floor for denying a jury trial in contempt cases because Michigan law does not independently offer a right to a jury trial in such cases. However, courts possess the contempt power in order to carry out their essential tasks, while the Legislature outlaws certain conduct in order to help society function. The need to carry out the prosecution for an offense explicitly labeled a misdemeanor by the Legislature is not analogous to a contempt case and, therefore, we conclude that the petty offense versus serious crime dichotomy reflected in the contempt case law does not apply here.

### C. THE MODERN CASE LAW CONNECTION BETWEEN INCARCERATION AND JURY TRIAL

There are several other Michigan cases in which we see the potential for incarceration, which is at the heart of the petty offense versus serious crime dichotomy, used as the trigger for a jury trial. It is noteworthy that, in those cases, Michigan courts have largely extended the right to a jury trial to petty offenses, without precisely addressing whether Sixth Amendment analysis applies under Const 1963, art 1, § 20.

One of the best examples in our case law comes from *People v Burnett*, 55 Mich App 649, 650; 223 NW2d 110 (1974), in which the defendant was accused of violating Battle Creek's municipal ordinance prohibiting people from furnishing alcohol to a minor. Conviction of this violation would subject a defendant to a maximum jail term of ninety days, a $500 fine, or both. *Id.* The defendant demanded a jury trial, but the district court denied her written request. *Id.* On appeal, this Court initially framed the question it addressed as "whether a person charged with violating a municipal ordinance providing for incarceration in the county jail for up to 90 days is guaranteed a right to trial by jury under article 1, § 20 of Michigan Constitution of 1963." *Burnett, supra* at 651. Interestingly enough, this Court noted the parties' competing arguments, much like the syllogisms outlined above, cited the text of Const 1963, art 1, § 20, and, in two short sentences, resolved the issue by reframing the question on appeal. *Burnett, supra* at 651. The Court said:

> Since our constitution grants the right to a trial by jury to an accused in every criminal prosecution, the controlling question to be decided is whether a proceeding to enforce a violation of a municipal ordinance is a criminal prosecution, where possible punishment in that proceeding involves incarceration. If such proceeding is a criminal prosecution, then the accused is entitled to a jury trial. [*Id.* at 651-652.]

Thus, to the *Burnett* panel, the plain language of the constitution was indisputably controlling and the only remaining issue was whether the proceeding in question was, indeed, a criminal prosecution. Although the *Burnett* panel did note the potential punishment for the violation involved in that case, it did not rest its

ultimate decision—that the defendant was entitled to a jury trial—squarely on the potential for incarceration. Rather, the Court in *Burnett* examined whether a judicial proceeding instituted to examine the defendant's alleged violation of a municipal ordinance was equivalent to a criminal prosecution under the general criminal statutes of the state. *Id.* at 653-655. Concluding that the proceeding in the district court was a criminal prosecution, the Court held:

> [W]here . . . a defendant is charged with violating a municipal ordinance which is in terms identical to a section of the general criminal legislation of the state or where the ordinance authorizes incarceration as a permissible sentencing alternative, said violation of such ordinance is a crime and, therefore, the defendant in such criminal prosecution is entitled to a jury trial as guaranteed by our state constitution. [*Id.* at 654-655.]

Under this holding in *Burnett*, the potential for incarceration is *not* a limit on when a defendant charged with a petty crime recognized in state law is entitled to demand and receive a jury trial. Instead, the reference to potential incarceration acts as a protection for people charged with unique municipal ordinance violations, or other quasi-criminal offenses, that might not otherwise result in proceedings considered "criminal prosecutions." Applied to this case, the *Burnett* holding clearly entitles Antkoviak to a jury trial because he is accused of violating a state law, not a unique municipal ordinance and, as we noted above, the proceeding in the district court was a criminal prosecution.

*Cahill v Fifteenth Dist Judge*, 70 Mich App 1, 2; 245 NW2d 381 (1976), built on *Burnett's* foundation. In *Cahill*, the prosecutor originally charged Cahill with

making an improper left turn in Ann Arbor, which carried with it a maximum punishment of ninety days in jail. *Id.* at 5. Both the court clerk and the district court refused Cahill's demand for a jury trial on the traffic ticket. *Id.* at 2-3. Cahill then instituted a class action in the Washtenaw Circuit Court seeking a writ of superintending control to compel, among other things, the district court to provide a jury trial when demanded. *Id.* at 3. The circuit court denied the complaint for superintending control. *Id.* On appeal, Cahill argued that defendants accused of violating municipal ordinances are entitled to jury trials, citing *Burnett. Id.* at 4. Judge HOLBROOK, JR., who had to resolve whether *Burnett* applied retroactively, reasoned that *Burnett* applied to the circumstances underlying *Cahill* and noted that Const 1963, art 1, § 20 continued to extend

> to the accused a right to trial by jury in every criminal prosecution . . . . Thus, whenever a defendant may receive a jail sentence, his prosecution constitutes a criminal prosecution and he is entitled to a jury trial under the Michigan Constitution. [*Cahill, supra* at 5.]

Again, as in *Burnett, Cahill* did not hold that a defendant is entitled to a jury trial only if he or she is subject to potential incarceration for the violation at issue. Rather, *Cahill* treated incarceration as a factor that indicated when a proceeding for violating a municipal ordinance was a "criminal prosecution," entitling the defendant to a jury trial under the 1963 constitution. Thus, *Cahill* would extend a jury trial in a case, such as the one here, in which there is no confusion regarding whether the defendant was "prosecuted" for a "crime."

*People v Goodwin*, 69 Mich App 471; 245 NW2d 96 (1976), goes much farther than *Burnett* and *Cahill* in explaining Michigan's approach to determining when a defendant is entitled to a jury trial. In *Goodwin*, this Court held that the defendant had the right to a jury trial because the misdemeanor offense charged, speeding in excess of the posted speed limit, was a "crime" and "our Michigan Constitution provides the right to a trial by jury in all criminal prosecutions." *Id.* at 473. The *Goodwin* panel acknowledged that there is "a host of United States Supreme Court cases for the proposition that a jury trial is not mandatory where a 'petty' offense is involved" and suggested that "the cause of justice might be better served were the right to jury trial precluded in such petty offenses." *Id.* at 474. Nevertheless, the Court explicitly rejected any attempt to align the interpretation of Const 1963, art 1, § 20 with the Sixth Amendment, noting that "it is also axiomatic that the state can grant its citizens rights which are greater than those in the United States Constitution" and that Michigan case law does support a broader right under the state constitution. *Goodwin, supra* at 473, citing *People v Anschutz*, 335 Mich 375; 56 NW2d 224 (1953); *Burnett, supra; People v Bell*, 53 Mich App 161; 218 NW2d 873 (1974).

At first glance, *People v Marshall*, 82 Mich App 92; 266 NW2d 678 (1978), appears to undo the progress *Goodwin* made in independently defining the state constitutional right to a jury trial in criminal prosecutions. The *Marshall* panel noted that, even though some protections available in criminal cases also apply to paternity actions, "it is generally accepted in Michigan that paternity actions are both civil and

criminal in nature." *Id.* at 96. The Court then commented that paternity actions are not designed "to punish a defendant" and that

> a paternity action does not result in imprisonment, but an order of filiation and liability for support. Thus, even if a paternity action is viewed as a criminal prosecution, a criminal jury trial is not constitutionally required; imprisonment is not a direct result of the action. [*Id.*]

The *Marshall* panel concluded that neither the state nor the federal constitutions required a jury trial in that case. *Id.* at 96-97.

However, the reference to *both* the Sixth Amendment and Const 1963, art 1, § 20 helps to explain the *Marshall* panel's later reference to incarceration and holds out the realistic possibility that *Marshall* did not intend to adopt incarceration as a trigger for the right to a jury trial under the *state* constitution. The *Marshall* panel's reference to incarceration is equally likely, if not more likely, to refer to the right to a jury trial under the Sixth Amendment without any attempt to define the contours of state constitutional law. Indeed, the *Marshall* opinion referred to Michigan cases when concluding that a paternity action did not constitute a "criminal prosecution" entitled to a jury trial, suggesting that Michigan case law does control this issue. Further, *Marshall* mentioned incarceration in tandem with citations to *Duncan* and *Cahill*. *Duncan* clearly holds out incarceration as the linchpin in Sixth Amendment analysis. However, we know that *Cahill* does not hold that potential incarceration is a prerequisite for a jury trial in prosecutions that are indisputably criminal prosecutions, but is a factor to be considered in quasi-criminal cases. As the *Mar-*

*shall* panel acknowledged at the outset of its analysis, a paternity action is not a criminal proceeding and so the potential for incarceration then becomes relevant. *Marshall, supra* at 95. As a result, the reference to incarceration related to Sixth Amendment analysis, or the unique Michigan analysis required when the offense at issue is not strictly a "crime." The end result is that while *Marshall* does not attempt to extend the right to a jury trial to all defendants, neither does it deny such a right to defendants in criminal prosecutions, like Antkoviak.

*People v Schomaker*, 116 Mich App 507; 323 NW2d 461 (1982), clarifies why *Burnett, Cahill*, and *Marshall* rely on incarceration as an important consideration for determining when defendants charged with quasi-crimes are entitled to jury trials. The *Schomaker* Court explained the unique change in law involved in that case:

> In 1978, the Legislature undertook a major revision of the Michigan Vehicle Code, by passing the civil infraction act, 1978 PA 510; MCL 257.741 *et seq.*; MSA 9.2441 *et seq.* The purpose of the act was to decriminalize certain routine traffic violations, which were thereafter to be deemed civil infractions. A person cited as being in violation of one of the enumerated code sections is provided with either an informal hearing before a referee or magistrate or a formal hearing before a judge. MCL 257.743(2)(c); MSA 9.2443(2)(c). In either hearing, however, the right to trial by jury is expressly denied. MCL 257.746(1); MSA 9.2446(1), MCL 257.747(4); MSA 9.2447(4). The maximum penalty for a civil infraction is a $100 fine plus costs from $5 to $100; no imprisonment is authorized. Possible imprisonment for civil contempt exists for a person who, after a hearing, refuses to pay a fine. However, the code makes it clear that such a person may be jailed only if he refuses to pay the fine, not

if he is unable to pay it. MCL 257.908; MSA 9.2608. [*Id.* at 511.]

The defendant in *Schomaker* challenged the statute's denial of a right to a jury under the civil jury provision, Const 1963, art 1, § 14, essentially claiming that the right to a jury trial attached to the statute when the constitution was adopted in 1963, despite the subsequent revisions. *Schomaker, supra* at 511-512. The *Schomaker* Court rejected the argument, explaining that the statute had undergone a meaningful change in 1978:

> [T]here was more than just a change in the form of the proceeding from criminal to civil. The change of the status of speeding violations from criminal to civil established a new cause of action that is not the substantial equivalent of the previous criminal act. In *Goodwin, supra,* we extended the right of trial by jury to speeding prosecutions because of the possible resulting stigma of a misdemeanor record and the potential sentence of 90 days imprisonment or a criminal fine or both.[25] It was the possibility of these criminal penalties and not the fact that the proceedings were *labelled* [sic] "criminal" instead of "civil" that concerned us. As the United States Supreme Court found in *In re Gault,* 387 US 1; 87 S Ct 1428; 18 L Ed 2d 527 (1967), when deciding whether the Fifth Amendment guarantee against compelled self-incrimination was applicable in juvenile proceedings labeled "civil," where the ultimate result might be incarceration the label placed on the proceeding is of no constitutional significance. Thus, any proceeding which

---

[25] As our discussion of *Goodwin, supra,* suggests, we do not fully agree with the *Schomaker* Court's interpretation of the reasoning in *Goodwin.* However, because the *Schomaker* Court construed *Goodwin* in the context of the right to a jury trial under Const 1963, art 1, § 14, not art 1, § 20, its interpretation of that earlier case does not apply well here. Furthermore, to the extent that there would be a conflict between *Schomaker* and our opinion today, because *Schomaker* was issued before November 1, 1990, it does not bind us. MCR 7.215(H)(1).

could result in a deprivation of an individual's liberty is to be afforded constitutional safeguards. [*Id.* at 513-514.]

The Court finally concluded that the Legislature did not act unconstitutionally in banning jury trials in cases involving speeding violations because the infraction was civil, not criminal. *Schmaker, supra* at 514. Furthermore, the legislation was constitutional because civil infractions had not been known in earlier constitutional history and, therefore, had not been tried to juries previously. *Id.* at 514-515. Consequently, the Legislature had not violated Const 1963, art 1, § 14, which would have preserved the right to a jury trial if it had previously been available in a particular case. *Schomaker, supra* at 514-515.

*Schomaker's* point, as is relevant to the jury trial issue in this case, is that the Legislature cannot defeat a defendant's constitutional rights simply by changing the label on an offense. Thus, when an otherwise minor statutory violation carries with it the potential for incarceration, courts treat such a violation as a crime, extending all applicable rights. Accordingly, in *Burnett* and *Cahill*, this Court extended the right to a jury trial for violations of municipal ordinances that could be viewed as defining crimes while *Marshall* denied the right to a jury trial because the underlying statute was neither purely criminal nor permitted incarceration.

The case here, however, is the exact opposite of *Schomaker. Instead of decriminalizing the offense of minor in possession of alcohol, the Legislature returned it to a criminal status through 1995 PA 122.* Why the Legislature took this action is not clear. However, we take the Legislature at its word. In this case, that word is "misdemeanor" in MCL 436.1703(1);

MSA 18.1175(703)(1), which is a crime specifically recognized in the language of Const 1963, art 1, § 20 and under the operational definition in MCL 750.5; MSA 28.195. That the offense in this case is petty is irrelevant. Even under the cases discussed in this section, which acknowledge a connection between incarceration and the right to a jury trial in a limited group of cases, we see no requirement that we *deny* the right to a jury trial for any offense that is clearly a "crime."[26]

## VII. CONCLUSION

The Legislature clearly intended to prohibit a minor from possessing alcohol by making that conduct a criminal offense. Therefore, prosecution for such an offense is a criminal prosecution. Because *Duncan* and its progeny examining the Sixth Amendment do not interpret our state constitution and there are a number of compelling reasons to depart from that standard, those cases do not provide the analysis that we employ under Const 1963, art 1, § 20.  Even though the offense of minor in possession of alcohol is petty and does not permit incarceration, the offense is a criminal misdemeanor. Antkoviak therefore had a right to a jury trial under the plain lan-

---

[26] To the extent *Marshall* and *Schomaker* might otherwise be read as limiting the right to a jury trial, they are distinguishable because they involve a quasi-crime and a civil infraction, not a pure "crime." In any event, they were both published before November 1, 1990, and do not bind us in the case of a conflict. MCR 7.215(H)(1). Were we forced to choose among these older cases to determine which provides the rule of law in this case, we believe that the holding in *Goodwin*, which addressed a misdemeanor, most closely accords with a textual interpretation of Const 1963, art 1, § 20 and would require a jury trial (unless waived) in *every* criminal prosecution, including the prosecution in this case.

guage of Const 1963, art 1, § 20. We conclude that Antkoviak's logic is the more compelling of the two competing "truths" in this case. We hold that because the offense of minor in possession of alcohol is a misdemeanor and is subject to criminal prosecution, the offense carries with it a constitutional right to a jury trial.

This case puts those of us who believe in a textual interpretation of the constitution, in order to ascertain its plain meaning, squarely to the test. We doubt that the fortunes of the people of Michigan will rise or fall depending on whether defendants charged with minor in possession of alcohol have the right to a jury trial. We do acknowledge that there are costs associated with such a requirement.[27] Judge BASHARA expressed our sentiment well when, in *Goodwin, supra* at 474, he stated that "the cause of justice might be better served" if there were no right to a jury trial in this sort of case. Indeed, were we in the position of setting policy in this area, we would reclassify minor in possession of alcohol as a civil infraction, albeit with the possibility of participation in substance abuse prevention programs and community service. Reclassifying this offense, however, is a task for the Legislature, not this Court.

Affirmed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

---

[27] Judge May asserts that, in 1998, the 90th District Court alone handled 259 minor in possession of alcohol complaints.